**AMERICAN RIVERS, INC., and the State Of Vermont, Petitioners,**

v.

**FEDERAL ENERGY REGULATORY COMMISSION, Respondent,**

**Green Mountain Power and Trout Unlimited, Intervenors.**

Nos. 1169, 1170, 1171 and 1172, Dockets 96–4110L, 96–4112CON, 96–4116CON and 96–4118CON.

United States Court of Appeals, Second Circuit.

Argued Jan. 30, 1997.

Decided Nov. 5, 1997.

Ronald A. Shems, Assistant Attorney General, (Jeffrey L. Amestoy, Attorney General, Montpelier, VT, on the brief), for Petitioner State of Vermont.

Richard A. Allen (Scott M. Zimmerman, Zuckert, Scoutt & Rasenberger, L.L.P, Washington, DC; Margaret Bowman, American Rivers, Inc., Washington, DC; Ronald J. Wilson, Sierra Club Legal Defense Fund, Davis, CA; Richard Roos-Collins, Natural Heritage Institute, San Francisco, CA, on the brief) for Petitioner American Rivers, Inc.

Eric L. Christensen (Susan Tomasky, General Counsel, Jerome M. Feit, Solicitor, Federal Energy Regulatory Commission, Washington, DC), for Respondent Federal Energy Regulatory Commission.

(William E. Roper, Neuse, Smith, Roper & Venman, P.C., Middlebury, VT, Mona Janopaul, Trout Unlimited, Arlington, VA), for Intervenor Trout Unlimited.

(Maureen F. Leary, Assistant Attorney General, New York State Department of Law, Environmental Protection Bureau, Dennis C. Vacco, Attorney General, Peter H. Schiff, Deputy Solicitor General, Albany, NY; Jeff Sessions, Attorney General, Craig Kneisel, Office of the Attorney General of the State of Alabama, Montgomery, AL; Bruce M. Botelho, Marie Sansone, Office of the Attorney General of the State of Alaska, Juneau, AK; Grant Woods, Attorney General, C. Tim Delaney, Office of the Attorney General of the State of Arizona, Phoenix, AZ; Winston Bryant, Attorney General, Royce O. Griffin, Office of the Attorney General of the State of Arkansas, Little Rock, AR; Daniel E. Lungren, Attorney General, Thomas F. Gede, Office of the Attorney General of the State of California, Sacramento, CA; Richard Blumenthal, Attorney General, Joseph Rubin, Office of the Attorney General of the State of Connecticut, Hartford, CT; M. Jane Brady, Attorney General, Kevin P. Maloney, Office of the Attorney General of the State of Delaware, Wilmington, DE; Robert A. Butterworth, Attorney General, Jonathan Glogau, Office of the Attorney General of the State of Florida, Tallahassee, FL; Margery S. Bronster, Attorney General, Dorothy D. Sellers, Office of the Attorney General of the State of Hawaii, Honolulu, HI; Alan G. Lance, Attorney General, Clive Strong, Office of the Attorney General of the State of Idaho, Boise, ID; Thomas J. Miller, Attorney General, David R. Sheridan, Office of the Attorney General of the State of Iowa, Des Moines, IA; Carla J. Stovall, Attorney General, John W. Campbell, Office of the Attorney General of the State of Kansas, Topeka, KS; Albert Benjamin Chandler, III, Attorney General, James Grawe, Office of the Attorney General of the State of Kentucky, James E. Bickford, Secretary of Natural Resources and Environmental Protection, Katheryn M. Hargraves, Natural Resources and Environmental Protection Cabinet, Frankfort, KY; Richard P. Ieyoub; Attorney General, David C. Kimmel, Office of the Attorney

General of the State of Louisiana, Baton Rouge, LA; Andrew Ketterer, Attorney General, Thomas A. Harnett, Office of the Attorney General of the State of Maine, Augusta, ME; J. Joseph Curran, Jr., Attorney General, Nancy W. Young, Office of the Attorney General of the State of Maryland, Baltimore, MD; Scott Harshbarger, Attorney General, Margaret Vandeusen, Office of the Attorney General of the Commonwealth of Massachusetts, Boston, MA; Frank J. Kelley, Attorney General of Michigan, Lansing, MI; Hubert H. Humphrey III, Attorney General, Richard S. Slowes, Office of the Attorney General of the State of Minnesota, St. Paul, MN; Mike Moore, Attorney General, Nicole Akins Boyd, Office of the Attorney General of the State of Mississippi, Jackson, MS; Jeremiah W. Nixon, Attorney General, James R. Layton, Office of the Attorney General of the State of Missouri, Jefferson City, MO; Joseph P. Mazurek, Attorney General, Clay R. Smith, Office of the Attorney General of the State of Montana, Helena, MT; Frankie Sue Del Papa, Attorney General, Brooke A. Nielsen, Office of the Attorney General of the State of Nevada, Carson City, NV; Jeffrey R. Howard, Attorney General, Michael J. Walls, Office of the Attorney General of the State of New Hampshire, Concord, NH; Peter Verniero, Attorney General of New Jersey, Trenton, NJ; Tom Udall, Attorney General of The State of New Mexico, Santa Fe, NM; Michael F. Easley, Attorney General, Marc D. Bernstein, Office of the Attorney General of the State of North Carolina, Raleigh, NC; Betty D. Montgomery, Attorney General, Simon Karras, Office of the Attorney General of the State of Ohio, Columbus, OH; Drew Edmondson, Attorney General, Miles Tolbert, Office of the Attorney General of the State of Oklahoma, Oklahoma City, OK; Theodore R. Kulongoski, Attorney General, Rives Kistler, Office of the Attorney General of the State of Oregon, Salem, OR; Thomas W. Corbett, Jr., Attorney General, Calvin R. Koons, Office of the Attorney General of the Commonwealth of Pennsylvania, Harrisburg, PA; Charles Molony Condon, Attorney General, J. Robert Bolchoz, Office of the Attorney General of the State of South Carolina, Columbia, SC; Charles W. Burson, Attorney General, Barry Turner, Office of the Attorney General of the State of Tennessee, Nashville, TN; Dan Morales, Attorney General, Javier P. Guajardo, Office of the Attorney General of the State of Texas, Austin, TX; Darrell V. McGraw, Jr., Attorney General, Silas B. Taylor, Office of the Attorney General of the State of West Virginia, Charleston, WV; Christine O. Gregoire, Attorney General of Washington, Olympia, WA; William U. Hill, Attorney General, Jay Woodhouse, Office of the Attorney General of the State of Wyoming, Cheyenne, WY), for Amici Curiae the States of New York, Alabama, Alaska, Arizona, Arkansas, California, Connecticut, Delaware, Florida, Hawaii, Idaho, Iowa, Kansas, Kentucky, Louisiana, Maine, Maryland, Massachusetts, Michigan, Minnesota, Mississippi, Missouri, Montana, Nevada, New Hampshire, New Jersey, New Mexico, North Carolina, Ohio, Oklahoma, Oregon, Pennsylvania, South Carolina, Tennessee, Texas, Washington, West Virginia, and Wyoming.

(Christopher M. Kilian, Harwell E. Coale, III, Vermont Natural Resources Council, Montpelier, VT), for Amicus Curiae Vermont Natural Resources Council, Inc.

(John R. Molm, Winifred D. Simpson, Clifford S. Sikora, Troutman Sanders, LLP, Washington, DC; William J. Madden, John A. Whitaker, IV, Winston & Strawn, Washington, DC; Alan M. Richardson, American Public Power Ass'n, Washington, DC; Donald H. Clarke, Wilkinson, Barker, Knauer & Quinn, Washington, DC; Henri D. Bartholomot, Washington, DC), for Amici Curiae Edison Elec. Inst., Central Vermont Pub. Serv. Corp., American Pub. Power Ass'n, and the National Hydropower Ass'n.

Before: WALKER, JACOBS and PARKER, Circuit Judges.

WALKER, Circuit Judge:

Petitioners, the State of Vermont and American Rivers, Inc., seek review of several orders issued by the Federal Energy Regulatory Commission ("FERC" or "Commission") licensing six hydropower projects located on rivers within the State of Vermont. The dispute surrounds (1) the authority of the State under § 401 of the Clean Water Act

("CWA"), 33 U.S.C. § 1341, to certify—prior to the issuance of a federal license—that such projects will comply with federal and state water quality standards and (2) the appropriate route for review of a state's certification decisions. The Commission argues that, when it determines that a state has exceeded the scope of its authority under § 401 in imposing certain pre-license conditions, it may refuse to include the *ultra vires* conditions in its license as it did in each of the proceedings at issue. Petitioners contend that the Commission is bound by the language of § 401 to incorporate all state-imposed certification conditions into hydropower licenses and that the legality of such conditions can only be challenged by the licensee in a court of appropriate jurisdiction. We agree with petitioners and, thus, grant the petition for review, vacate the Commission's orders, and remand.

## I. BACKGROUND

### A. *The Licensing Proceedings and the Statutory Scheme*

The principal order under review in this proceeding arises from the efforts of the Tunbridge Mill Corporation ("Tunbridge") to obtain a license from FERC for the operation of a small hydroelectric facility on the First Branch of the White River in Orange County, Vermont, restoring an historic mill site in Tunbridge Village. Pursuant to § 401(a)(1) of the CWA, 33 U.S.C. § 1341(a)(1), an applicant for a federal license for any activity that may result in a discharge into the navigable waters of the United States must apply for a certification from the state in which the discharge originates (or will originate) that the licensed activity will comply with state and federal water quality standards. *See P.U.D. No. 1 of Jefferson County v. Washington Dep't of Ecology*, 511 U.S. 700, 707–09, 114 S.Ct. 1900, 1907, 128 L.Ed.2d 716 (1994). Such certifications, in accordance with § 401(d), 33 U.S.C. § 1341(d), shall

set forth any effluent limitations and other limitations, and monitoring requirements necessary to assure that any applicant for a Federal license or permit will comply with any applicable effluent limitations and other limitations, under section 1311 or 1312 of this title, standard of performance under section 1316 of this title, or prohibition, effluent standard, or pretreatment standard under section 1317 of this title, and with any other appropriate requirement of State law set forth in such certification. . . .

The CWA further provides that the state certification "shall become a condition on any Federal license or permit subject to the provisions of this section." *Id.*

On October 15, 1990, Tunbridge petitioned the responsible state agency, Vermont's Agency of Natural Resources ("VANR"), for certification of the project. *See* 10 Vt. Stat. Ann. § 1004; Vt. Water Pollution Control Reg. § 13.10. After several discussions, Tunbridge and VANR agreed on the conditions to be embodied by the certification. The VANR issued a draft certification on September 18, 1991, for public notice and comment in compliance with § 401(a)(1), 33 U.S.C. § 1341(a)(1), and Vermont law. A week later, on September 25, 1991, the certification was issued. No one challenged the ruling through the state's process of administrative and judicial review, and thus the certification became final fifteen days later. *See* 10 Vt. Stat. Ann. § 1024(a).

As issued, the certification contained eighteen conditions (designated by letters "A" through "R"), three of which, P, J, and L, are relevant for our purposes. Condition P reserves the right in Vermont to amend (or "reopen") the certification when appropriate.[1] Condition J requires Tunbridge to submit to the state for review and approval any plans for significant changes to the project.[2] Finally, condition L requires Tunbridge to seek clearance from the state before commencing

---

1. Condition P reads, in full: "The Department is reserving the right to add and alter terms and conditions as appropriate to carry out its responsibilities during the life of the project with respect to water quality."

2. Condition J reads, in full: "Any significant changes to the project, including project operation, must be submitted to the Department for prior review and written approval."

construction so that the state may ensure that plans are in place to control erosion and manage water flows.[3]

Certificate in hand, Tunbridge sought a license from FERC, which is vested with authority under § 4(e) of the Federal Power Act ("FPA"), 16 U.S.C. § 797(e), to issue licenses for "the development, transmission, and utilization of power across, along, from, or in any of the streams or other bodies of water over which Congress has jurisdiction . . . ." FERC may issue such licenses "[w]henever the contemplated improvement is, in the judgment of the Commission, desirable and justified in the public interest," *id.*, and "best adapted to a comprehensive plan . . . for the improvement and utilization of water-power development, for the adequate protection, mitigation, and enhancement of fish and wildlife . . ., and for other beneficial public uses," 16 U.S.C. § 803(a)(1).

On July 15, 1994, FERC entered its Order Issuing License in which the Commission granted Tunbridge a 40-year license "to construct, operate, and maintain the Tunbridge Mill Project." However, reversing the Commission's longstanding policy that review of the appropriateness of § 401 conditions is solely within the purview of state courts, *see, e.g., Town of Summersville*, 60 Fed. Energy Reg. Comm'n Rep. (CCH) ¶ 61,291, at 61,990 (1992), *Carex Hydro*, 52 Fed. Energy Reg. Comm'n Rep. (CCH) ¶ 61,216 at 61,769 (1990), *Central Maine Power Co.*, 52 Fed. Energy Reg. Comm'n Rep. (CCH) ¶ 61,033 at 61,172 (1990), FERC found that conditions P, J, and L were beyond the scope of Vermont's authority under the CWA. Accordingly, FERC refused to incorporate them into the Tunbridge license.

The State of Vermont and American Rivers filed motions to intervene and petitions for rehearing in mid-August 1994, challenging the authority of FERC to review and reject state-imposed § 401 conditions.[4] By order of May 17, 1996, the Commission granted the motions to intervene and denied the motions for rehearing, elaborating on the rationale for its decision to reject the conditions. Vermont and American Rivers now seek review in this court of the Commission's determination in appeals numbered 96–4110 and 96–4112.

During the period Tunbridge was seeking certification and licensure, on November 13, 1992, intervenor, Green Mountain Power Corporation ("GMP"), sought Vermont's certification of its Essex No. 19 project, a 7.2–megawatt facility on the Winooski River, a tributary of Lake Champlain, located in the townships of Essex Junction and Williston, Vermont. VANR issued a draft certification for notice and comment on September 3, 1993. After holding a hearing and obtaining written comments, VANR issued a final § 401 certificate on November 8, 1993, which was later amended on January 1, 1995. GMP did not seek review of the certification decision, and the decision became final on January 15, 1995.

As issued, the § 401 certificate contained twenty conditions (denominated letters "A" through "T"), several of which, B, E, H, K, M, N, S, and T, are relevant to this case. In condition T, Vermont reserves the right to reopen the certification when appropriate, in language somewhat different from the reopener condition included in the Tunbridge certification.[5] Condition S requires GMP, in

---

3. Condition L reads, in full:
   No construction may commence until after the Department has issued written approval under Conditions B, C, D, and J and until Fish and Wildlife has issued written approval under Condition E. Operation changes made after project completion are subject to Condition I and must be approved prior to effecting the change.
   Conditions B and C address minimum water flow and plans for monitoring water flow; condition D addresses erosion control; condition E addresses plans for a downstream fish passage; and condition I addresses procedures for desilting the dam's impoundment area.

4. Any review of a FERC order before a court of appeals must be preceded by a rehearing petition before the agency. *See* 16 U.S.C. § 825l(a) ("No proceeding to review any order of the Commission shall be brought by any person unless such person shall have made application to the Commission for a rehearing thereon.").

5. Condition T reads, in full: "The Department may request, at any time, that FERC reopen the license to consider modifications to the license necessary to assure compliance with Vermont Water Quality Standards."

language comparable to that in the pre-approval condition in the Tunbridge certificate, to submit to the state for review and approval any significant changes to the project.[6] Similarly, condition M (relating to maintenance of the project)[7] requires GMP to submit for review and approval all proposals for maintenance of the project affecting the river. Condition K (relating to construction of a fish passage)[8] and condition N (relating to the construction of canoe portage facilities)[9] contained specific construction deadlines. Finally, in condition E (relating to peak water flow)[10] and condition H (relating to minimum water levels),[11] Vermont reserves the authority to alter the conditions at some later time.[12]

On December 26, 1991, while awaiting state certification, GMP applied for a license from FERC to operate the Essex No. 19 hydroelectric project. On March 30, 1995, the Commission, by "Order Issuing New License," granted GMP a 30–year license. Relying largely on its reasoning in *Tunbridge Mill*, 68 Fed. Energy Reg. Comm'n Rep. (CCH) ¶ 61,078 (1994), the Commission found that several conditions—conditions T and S and aspects of conditions B, E, H, K,

M, and N, discussed earlier—were beyond the scope of Vermont's authority under the CWA. *See Green Mountain Power Corp.*, 70 Fed. Energy Reg. Comm'n Rep. (CCH) ¶ 62,205 at 64,435–38 (1995). Accordingly, FERC refused to incorporate the suspect provisions into the license. The State of Vermont, already having intervened in the proceeding, petitioned for rehearing on April 27, 1995, again challenging the authority of FERC to review and reject state-imposed § 401 conditions. By order of June 3, 1996, the Commission denied the state's motion for rehearing, elaborating on the rationale for its decision to reject the conditions. *Green Mountain Power Corp.*, 75 Fed. Energy Reg. Comm'n Rep. (CCH) ¶ 61,250 (1996). Vermont seeks review of the Commission's determination in appeal number 96–4116.

Finally, during a similar time frame, the Central Vermont Public Service Corp. ("CVPS"), also sought certification in connection with their efforts to relicense four small hydroelectric facilities on the Passumpsic River near the town of St. Johnsbury, Vermont: the 0.7 megawatt Passumpsic Hydroelectric Project; the 0.25 megawatt Pierce

---

6. Condition S reads, in full: "Any change to the project that would have a significant or material effect on the findings, conclusions, or conditions of this certification, including project operation, must be submitted to the Department for prior review and written approval."

7. Condition M provides, in full: "Any proposals for project maintenance or repair work involving the river, including desilting of the dam impoundment, impoundment drawdowns to facilitate repair/maintenance work, and tailrace dredging, shall be filed with the Department for prior review and approval."

8. Condition K provides, in pertinent part:

The applicant shall submit a plan for downstream fish passage to the Department of Fish and Wildlife for review. Downstream passage shall be provided 24 hours per day, April 1— June 15 and September 15—December 15 and shall be functional at all operating impoundment levels, with the period subject to adjustment based on knowledge gained about migration periods for migratory salmonoids. Downstream fish passage facilities shall be installed so as to be operational in the spring of 1996....

9. Condition N requires, in relevant part, that "[t]he applicant ... provide a canoe portage on

the right (north) side of the impoundment and river at Essex No. 19 Dam by May 1, 1995."

10. Condition E, as amended, permits exceptions to peak flow limits in certain circumstances, including times of local power emergencies, and after having "provided notice and an opportunity for hearing, the Secretary of the Agency may modify th[e] exception[s] as appropriate."

11. Condition H, as amended, allows GMP to let the water level in the impoundment area to recede beneath a minimum level in certain emergency conditions and provides, as well, that "this exception may be modified by the Secretary of the Agency ... as appropriate after consultation with GMP and an opportunity for hearing."

12. Although condition B (relating to minimum water flow) differs from condition E and condition H in that it does not contain explicit exceptions to ordained water or flow levels, the report accompanying the certification indicates that the GMP has discretion to alter the levels. At the same time, however, the report states that Vermont may restrict such discretion at some later date. To the extent that the report may be considered to permit the state to alter the terms of the condition at some later date, FERC rejected the reservation of authority by the state.

Mills Hydroelectric Project; the 0.35 mega-watt Arnold Falls Hydroelectric Project; and the 0.7 megawatt Gage Hydroelectric Project. On June 21, 1993, CVPS sought certification from VANR for each of the four projects individually. Draft certifications were issued on March 2, 1994, for review and comment, and VANR issued the final § 401 certificates on June 16, 1994.[13]

The certifications for the four projects contained between sixteen and nineteen conditions. As with the other certifications at issue in this case, VANR imposed conditions with which FERC took exception. Although FERC granted 40-year licenses for each of CVPS's projects by orders issued December 8, 1994, the Commission rejected three conditions and a portion of a fourth contained in each of the four licenses, relying on the rationale of *Tunbridge Mill*, 68 Fed. Energy Reg. Comm'n Rep. (CCH) ¶ 61,078 (1994). *See Central Vermont Pub. Serv. Corp.*, 69 Fed. Energy Reg. Comm'n Rep. (CCH) ¶¶ 62,197; 62,198; 62,199; 62,200 (1994), *reh'g denied*, 75 Fed. Energy Reg. Comm'n Rep. (CCH) ¶ 61,263 (1996). One such condition required CVPS to seek approval from the state for any proposal for maintenance or repair of the project involving the river.[14]

Another required CVPS to seek approval from the state for any proposed changes in the operation of the project.[15] A third reserved to the state the right to request FERC to reopen the license to consider any modification necessary for compliance with state water quality standards.[16] Finally, the Commission rejected a portion of a condition that required CVPS to construct facilities for upstream fish passage within two years of being ordered to do so by the state.[17]

Already having intervened in the licensing proceedings, the State of Vermont moved for rehearing, again contesting the authority of FERC to reject states' § 401 conditions. By order of June 4, 1996, the Commission denied Vermont's motion for rehearing. *See Central Vermont Pub. Serv. Corp.*, 75 Fed. Energy Reg. Comm'n Rep. (CCH) ¶ 61,263 (1996). The state seeks review of the Commission's determination in appeal number 96–4118.

### B. *The Commission's Decisions*

Prior to *Tunbridge Mill*, 68 Fed. Energy Reg. Comm'n Rep. (CCH) ¶ 61,078 (1994), FERC had held that it was required by § 401 to include in its licenses all conditions imposed by a state in its certifications notwithstanding the Commission's view that the

13. CVPS did not seek review of the certificates; however, on July 1, 1994, a local environmental group did so, and the appeal is currently pending before the Vermont Water Resources Board. The certifications are stayed pending appeal. *See* 10 Vt. Stat. Ann. § 1024(a). Because we find that the Commission is without the authority to review and reject state-imposed § 401 conditions, we need not address whether these licenses were ripe for consideration by FERC. Moreover, because no party has raised the issue before this court, we do not address the question whether the Commission properly issued the licenses in light of the pendency of the appeals. *See* 33 U.S.C. § 1341(a)(1).

14. The language of this condition reads, in full: "Any proposals for project maintenance or repair work involving the river, including desilting of the dam impoundment, impoundment drawdowns to facilitate repair/maintenance work, and tailrace dredging, shall be filed with the Department for prior review and approval." Condition L in the Passumpsic certificate, condition J in the Pierce Mills and Arnold Falls certificates, and condition M in the Gage certificate.

15. This condition reads, in full: "Any change to the project that would have a significant or material effect on the findings, conclusions, or condi-

tions of this certification, including project operation, must be submitted to the Department for prior review and written approval." Condition O in the Passumpsic, Pierce Mills and Arnold Falls certificates and condition R in the Gage certificate.

16. The condition reads, in full: "The Department may request, at any time, that FERC reopen the license to consider modifications to the license necessary to assure compliance with Vermont Water Quality Standards." Condition P in the Passumpsic, Pierce Mills and Arnold Falls certificates and condition S in the Gage certificate.

17. The condition reads, in relevant part:

Within two years of a written request by the Agency, the applicant shall provide for upstream fish passage, subject to plan approval by the Department of Fish and Wildlife. The U.S. Fish and Wildlife Service and the Department of Fish and Wildlife shall be consulted during plan development....

Condition G in the Passumpsic, Pierce Mills and Arnold Falls certificates and condition J in the Gage certificate.

conditions were beyond a state's authority under § 401. *See, e.g., Town of Summersville,* 60 Fed. Energy Reg. Comm'n Rep. (CCH) ¶ 61,291 at 61,990 (1992); *Carex Hydro,* 52 Fed. Energy Reg. Comm'n Rep. (CCH) ¶ 61,216 at 61,769 (1990); *Central Maine Power Co.,* 52 Fed. Energy Reg. Comm'n Rep. (CCH) ¶ 61,033 at 61,172 (1990). For example, in *Town of Summersville,* FERC stated:

We believe that these conditions are beyond the scope of Section 401, and that states should not use their water quality certification authority to impose conditions that are unrelated to water quality. However, since pursuant to Section 401(d) of the Clean Water Act all of the conditions in the water quality certification must become conditions in the license, review of the appropriateness of the conditions is within the purview of state courts and not the Commission. The only alternatives available to the Commission are either to issue a license with the conditions included or to deny [the] application, and we do not believe it is in the public interest to deny the application.

60 Fed. Energy Reg. Comm'n Rep. (CCH) ¶ 61,291 at 61,990. The Environmental Protection Agency ("EPA"), the Federal agency vested with the authority to administer and implement the CWA, continues to share this view. *See* 33 U.S.C. § 1251(d), *see also* 40 C.F.R. pt. § 130. Pursuant to its authority to issue discharge permits under the National Pollutant Discharge Elimination System ("NPDES"), the EPA promulgated 40 C.F.R. § 124.55(e) which provides that "[r]eview and appeals of limitations and conditions attributable to State certification shall be made through the applicable procedures of the State ... " 40 C.F.R. § 124.55(e); *see also Roosevelt Campobello Int'l Park Comm'n v. United States Environmental Protection Agency,* 684 F.2d 1041, 1055–56 (1st Cir. 1982).

In *Tunbridge Mill,* however, the Commission reversed field, finding that "[t]o the extent that states include conditions that are unrelated to water quality, these conditions are beyond the scope of Section 401 and are thus unlawful." 68 Fed. Energy Reg. Comm'n Rep. (CCH) ¶ 61,078 at 61,387. The Commission continued, "We conclude that we have the authority to determine that such conditions do not become terms and conditions of the licenses we issue." *Id.* The Commission reasoned, in part: "We believe that, in light of Congress' determination that the Commission should have the paramount role in hydropower licensing process, whether certain state conditions are outside the scope of Section 401(d) is a federal question to be answered by the Commission." *Id.* In its decision denying petitioners' motion for rehearing, the Commission elaborated on its prior ruling. *See Tunbridge Mill,* 75 Fed. Energy Reg. Comm'n Rep. (CCH) ¶ 61,175 (1996).

In the other licensing decisions, the Commission relied on its reasoning in *Tunbridge Mill* in finding that "states may, under Section 401(d) of the CWA, impose conditions related solely to water quality." *Green Mountain Power Corp.,* 70 Fed. Energy Reg. Comm'n Rep. (CCH) ¶ 62,205 at 64,435 (1995), *reh'g denied,* 75 Fed. Energy Reg. Comm'n Rep. (CCH) ¶ 61,250 (1996); *Central Vermont Pub. Serv. Corp.,* 69 Fed. Energy Reg. Comm'n Rep. (CCH) ¶¶ 62,197; 62,198; 62,199; 62,200 (1994), *reh'g denied,* 75 Fed. Energy Reg. Comm'n Rep. (CCH) ¶ 61,263 (1996). Petitioners contest the Commission's expansion of its authority.

## II. DISCUSSION

The principal dispute between petitioners and the Commission in this case surrounds the relative scope of authority of the states and the Commission under the CWA and the FPA. Petitioners' contention is straightforward, resting on statutory language. In their view, the plain language of § 401(d) indicates that FERC has no authority to review and reject the substance of a state certification or the conditions contained therein and must incorporate into its licenses the conditions as they appear in state certifications. FERC disagrees, arguing that the language of § 401(d) is not as clear as petitioners would have it. Rather, FERC contends, it is bound to accede only to those conditions that are within a state's authority under § 401, that is, conditions that are rea-

sonably related to water quality and that otherwise conform to the dictates of § 401. *See Tunbridge Mill,* 68 Fed. Energy Reg. Comm'n Rep. (CCH) ¶ 61,078 at 61,387. The Commission also argues that without the authority to reject state-imposed § 401 conditions its Congressionally mandated role under the FPA of ensuring comprehensive planning and development of hydropower would be undermined.

### A. *The Clean Water Act*

■ Before considering the Commission's contentions regarding the CWA, we note that FERC's interpretation of § 401, or any other provision of the CWA, receives no judicial deference under the doctrine of *Chevron USA, Inc. v. Natural Resources Defense Council,* 467 U.S. 837, 104 S.Ct. 2778, 81 L.Ed.2d 694 (1984), because the Commission is not Congressionally authorized to administer the CWA. *See* 33 U.S.C. § 1251(d) ("Except as otherwise expressly provided in this chapter, the Administrator of the Environmental Protection Agency ... shall administer this chapter."); *see also West v. Bowen,* 879 F.2d 1122, 1137 (3d Cir.1989) (holding that "[n]o deference is owed an agency's interpretation of another agency's statute"); *Oregon Natural Desert Assoc. v. Thomas,* 940 F.Supp. 1534, 1540 (D.Or.1996) (holding that United States Forest Service's interpretation of § 401 of the CWA is not entitled to deference because Congress delegated administration of the CWA to the EPA alone). Thus, we review *de novo* the Commission's construction of the CWA.

■ We begin, as we must, with the statute itself. In this case, the statutory language is clear. Section 401(a), which is directed both to prospective licensees and to the federal licensing agency (in this case, the Commission), provides, in relevant part:

Any applicant for a Federal license or permit to conduct any activity ... which may result in any discharge into the navigable waters, shall provide the licensing or permitting agency a certification from the State in which the discharge originates or will originate.... No license or permit shall be granted until the certification required by this section has been obtained or

has been waived.... No license or permit shall be granted if certification has been denied by the State....

33 U.S.C. § 1341(a). More important, § 401(d), reads, in pertinent part:

Any certification provided under this section ... *shall* become a condition on any Federal license or permit subject to the provisions of this section.

33 U.S.C. § 1341(d) (emphasis added). This language is unequivocal, leaving little room for FERC to argue that it has authority to reject state conditions it finds to be *ultra vires.* Rather, in this case, to the extent that the Commission contends that Congress intended to vest it with authority to reject "unlawful" state conditions, the Commission faces a difficult task since it is generally assumed—absent a clearly expressed legislative intention to the contrary—"that Congress expresses its purposes through the ordinary meaning of the words it uses...." *Escondido Mut. Water Co. v. La Jolla Band of Mission Indians,* 466 U.S. 765, 772, 104 S.Ct. 2105, 2110, 80 L.Ed.2d 753 (1984).

The Commission argues that, notwithstanding the mandatory language of the provision, § 401(d) itself restricts the substantive authority of states to impose conditions: "Section 401 authorizes states to impose only conditions that relate to water quality." *Tunbridge Mill,* 68 Fed. Energy Reg. Comm'n (CCH) ¶ 61,078 at 61,387. This is plainly true. Section 401(d), reasonably read in light of its purpose, restricts conditions that states can impose to those affecting water quality in one manner or another. *See P.U.D. No. 1 of Jefferson County,* 511 U.S. at 711–13, 114 S.Ct. at 1909 (holding that a state's authority to impose conditions under § 401(d) "is not unbounded"). However, this is not tantamount to a delegation to FERC of the authority to decide which conditions are within the confines of § 401(d) and which are not. And this is the crux of the dispute in this case.

In addition to § 401(d), the Commission relies on several other provisions of the CWA in arguing that it has the authority to review and reject state-imposed conditions that are deemed by the Commission to exceed a

state's power under § 401 of the CWA. In particular, the Commission invokes § 401(a)(3) and § 401(a)(5) of the CWA.

Section 401(a)(3) establishes a presumption that a state's § 401 certification obtained in order to procure a federal construction permit—for instance, a dredge-and-fill permit issued by the Army Corps of Engineers pursuant to § 404 of the CWA, 33 U.S.C. § 1344(a)—will fulfill the requirements for a subsequent federal permit governing the operation of the facility constructed pursuant to that certification. The presumption, however, may be overcome if certain conditions arise and the state then takes the procedural steps set forth by § 401(a)(3).[18] However, even assuming the applicability of § 401(a)(3) to the facts of this case (a matter that is far from certain [19]), the Commission has not established that it has been vested by Congress with the authority to determine whether state-imposed conditions are consistent with this provision. Nor has the Commission done so with respect to § 401(a)(5) of the CWA, 33 U.S.C. § 1341(a)(5),[20] which provides the licensing agency (in this case FERC) with authority to enforce the terms of a license—which pursuant to § 401(d) include a state's § 401 certification conditions—once such a federal license has issued. Thus, the Commission's arguments relying on these provisions suffer from the same infirmity as does its argument relying on

§ 401(d). The Commission assumes the very question to be decided: whether FERC—and not a court of appropriate jurisdiction on appeal by an applicant—has the authority to review the legality of state-imposed § 401 conditions in the first instance.

Beyond the statutory language of § 401, the Commission relies primarily on the decision of the Court of Appeals for the District of Columbia Circuit in *Keating v. Federal Energy Regulatory Comm'n,* 927 F.2d 616 (D.C.Cir.1991). In FERC's view, the *Keating* court flatly rejected petitioner's argument based on the plain meaning of § 401(d) and vested the Commission with the authority to review and reject conditions that violate the terms of § 401. The Commission, however, reads *Keating* too broadly.

In *Keating* an individual obtained a permit from the Army Corps of Engineers to build a dam. Because the project's construction would result in a discharge into navigable waters within the State of California, Keating sought and received from California a § 401 certification permitting construction to go forward. *Id.* at 619. Following the construction of a dam—but prior to its licensure for operation—the state purported to withdraw its certification without paying heed to the requirements of § 401(a)(3), and FERC withheld its license to operate the completed facility on this basis. The prospective licensee sought review.

**18.** In particular, § 401(a)(3) provides that the state, upon proper notice from the licensing agency (in this case FERC), must inform the licensing agency, within 60 days of such notice, that because of some change in circumstance since the initial certification was granted, state officials believe that there are no longer reasonable assurances that the licensee will continue to abide by the applicable standards. *See Keating v. Federal Energy Regulatory Comm'n,* 927 F.2d 616, 621–22 (D.C.Cir.1991) (summarizing section 401(a)(3)). The changes of circumstance recognized as relevant under 401(a)(3) are those relating to (1) the construction or operation of the facility, (2) the characteristics of the waters into which the discharge is made, (3) the applicable water quality criteria, and (4) the applicable effluent limitations or other requirements.

**19.** Contrary to the Commission's contention, *see* Brief of the Fed. Energy Regulatory Comm'n at 11 (stating that § 401(a)(3) "imposes specific limits on the ability of states to alter their certifications once they have been incorporated into a

federal license"), § 401(a)(3) governs a rather narrow class of cases of which this one is not a member: cases in which a license applicant has already obtained a state certification—and a federal license incorporating that certification—in connection with the construction of a facility and then seeks a federal operating license. This case, on the other hand, presents the more general question whether a state has the authority to amend or revoke a § 401 certification underlying a federal operating license.

**20.** Section 401(a)(5) of the CWA, 33 U.S.C. § 1341(a)(5), provides that

[a]ny Federal license or permit with respect to which a certification has been obtained ... may be suspended or revoked by the Federal agency issuing such license or permit upon the entering of a judgment under this chapter that such facility or activity has been operated in violation of the applicable provisions of section 1311, 1312, 1313, 1316, or 1317 of this title. 33 U.S.C. § 1341(a)(5).

The D.C. Circuit found that a federal agency, when issuing a license covered by § 401 of the CWA, must ascertain whether a valid state certification exists, and as a necessary part of that determination, the Commission must determine, among other things, whether a state had properly revoked its prior certification pursuant to its authority under § 401(a)(3). In this instance, the court found that California—having already issued a certification in connection with the construction of the dam—could revoke or alter the certification only as provided by § 401(a)(3). Because California did not comply with the terms of § 401(a)(3), the court found that a valid certification existed and the Commission had no choice but to recognize it. *Id.* at 623–24.

*Keating* addresses the narrow question of the Commission's authority to determine whether a valid § 401 certificate exists prior to issuing its license. 927 F.2d at 625 (the Commission is authorized to "decide whether the state's assertion of revocation satisfies section 401(a)(3)'s predicate requirements—i.e., whether it is timely and motivated by some change in circumstances after the certification was issued"); *see also* 33 U.S.C. § 401(a)(1) ("No license or permit shall be granted if certification has been denied by the State. . . ."). Nothing in *Keating* supports a broad authority on the part of the Commission to review a state's designation of certain conditions in the state's § 401 certification. *See Keating,* 927 F.2d at 622–23; *see also United States Dep't of the Interior v. Federal Energy Regulatory Comm'n,* 952 F.2d 538, 548 (D.C.Cir.1992) ("FERC may not alter or reject conditions imposed by the

states through section 401 certificates") (citing *Keating,* 927 F.2d at 622–23); Lisa M. Bogardus, *State Certification of Hydroelectric Facilities Under Section 401 of the Clean Water Act,* 12 Va. Envtl. L.J. 43, 95 (1992) (summarizing *Keating,* in part, to hold that "neither a federal agency nor a federal court may review the appropriateness of conditions attached to the certificate or review the grant or denial of a certificate").

*Escondido Mut. Water Co. v. La Jolla, Rincon, San Pasqual, Pauma & Pala Band of Mission Indians,* 466 U.S. 765, 104 S.Ct. 2105, 80 L.Ed.2d 753 (1984)—a case which the Commission goes to great lengths to distinguish—is more on point. In *Escondido,* the Supreme Court was called upon to consider a strikingly analogous factual and legal scenario. At issue was a pre-license certification scheme within the FPA itself, permitting (in this instance) the Secretary of the Interior to impose requirements on licenses issued "within" any Native American "reservation." In particular, this certification scheme, § 4(e) of the FPA, 16 U.S.C. § 797(e), provides that licenses issued under this provision "*shall* be subject to and contain such conditions as the Secretary of the department under whose supervision such reservation falls shall deem necessary for the adequate protection and utilization of such reservation." 16 U.S.C. § 797(e) (emphasis added).[21] FERC, however, refused to accept the Secretary's conditions, and an aggrieved party sought review. In construing § 4(e), the Supreme Court focused closely on the provision's plain language, remarking that "[t]he mandatory nature of the language chosen by Congress appears to require that the

---

**21.** Section 4(e) of the FPA, 16 U.S.C. § 797(e), provides, in part:

The Commission is authorized and empowered—(e) To issue licenses . . . to any corporation organized under the laws of the United States or any State thereof . . . for the purpose of constructing, operating, and maintaining dams, water conduits, reservoirs, power houses, transmission lines, or other project works necessary or convenient . . . for the development, transmission, and utilization of power across, along, from or in any of the streams or other bodies of water over which Congress has jurisdiction under its authority to regulate commerce with foreign nations and among the several States, or upon any part of the public

lands and reservations of the United States (including the Territories), or for the purpose of utilizing the surplus water or water power from any Government dam, except as herein provided: *Provided,* That licenses shall be issued within any reservation only after a finding by the Commission that the license will not interfere or be inconsistent with the purpose for which such reservation was created or acquired, and shall be subject to and contain such conditions as the Secretary of the department under whose supervision such reservation falls shall deem necessary for the adequate protection and utilization of such reservation. . . .

Commission include the Secretary's conditions in the license even if it disagrees with them." *Escondido*, 466 U.S. at 772, 104 S.Ct. at 2110. Consistent with this view, the Court gave effect to the plain language of § 4(e), 16 U.S.C. § 797(e), finding no "clear expressions of legislative intent to the contrary." *Id.*

Although *Escondido* arose in a different context, it is instructive in this case for several reasons. In both contexts, FERC is required in clear statutory language to incorporate conditions imposed by an independent governmental agency with special expertise, in *Escondido*, the Department of the Interior, 16 U.S.C. § 797(e), and in this instance, the states, *see* 33 U.S.C. § 1251(b) ("It is the policy of the Congress to recognize, preserve, and protect the primary responsibilities and rights of States to prevent, reduce, and eliminate pollution ...."); *see also United States v. Commonwealth of Puerto Rico*, 721 F.2d 832, 838 (1st Cir.1983) ("states are the prime bulwark in the effort to abate water pollution"). In both cases, the Commission attempted to ignore this command and substitute its own judgment for that of the certifying agency. In both cases, the real issue in dispute is not whether there are limits on the certifying agency's authority to impose conditions on federal licenses, but "whether the Commission is empowered to decide when the ... conditions exceed the permissible limits." *Escondido*, 466 U.S. at 777, 104 S.Ct. at 2112–13. In neither case do the underlying statutes or their schemes for administrative and judicial review suggest that Congress wanted the Commission to second-guess the imposition of conditions.

Finally, and most persuasively, in both cases the Commission argued that without the authority to review conditions imposed by the certifying agency its ability to carry out its statutory mission would be compromised. In *Escondido*, notwithstanding this contention, the Supreme Court found that absent a challenge by the applicant-licensee, the Interior Secretary's conditions must either be incorporated in full into any license that it issues or the Commission must deny the license altogether. 466 U.S. at 778 n. 20, 104 S.Ct. at 2113 n. 20. In reaching this conclusion, the Court expressly addressed difficulties inherent in such a statutory scheme, difficulties the Commission decries in this case:

> We note that in the unlikely event that none of the parties to the licensing proceeding seeks review, the conditions will go into effect notwithstanding the Commission's objection to them since the Commission is not authorized to seek review of its own decisions. The possibility that this might occur does not, however, dissuade us from interpreting the statute in accordance with its plain meaning. Congress apparently decided that if no party was interested in the differences between the Commission and the Secretary, the dispute would best be resolved in a nonjudicial forum.

*Id.*

The Commission's efforts to distinguish *Escondido* are unavailing. FERC's principal contention relies on a portion of *Escondido* that has no bearing on this case. The Supreme Court—in addition to concluding that the Commission has no authority to reject conditions imposed by the Secretary under § 4(e) of the FPA, 16 U.S.C. § 797(e)—also held that the Commission was not required to incorporate into its license several of the Secretary's conditions which applied to Native American reservations on which none of the licensed facilities were located. According to the Court, such conditions would violate § 4(e)'s requirement that FERC licenses issued to projects "within any [federal] reservation" shall contain conditions for the "adequate protection and utilization of *such* reservation." *Id.* at 780, 104 S.Ct. at 2114 (citing 16 U.S.C. § 797(e)) (emphasis added).

This rather unremarkable holding does not support the Commission's contention that it may review and reject *any* state-imposed condition that it finds to be violative of § 401. We agree with petitioners that the limitation in the scope of the authority of the Commission, affirmed in *Escondido*, is analogous to the inherent limitation on the authority of the Commission in cases such as this. While the Commission may determine whether the proper state has issued the certification or whether a state has issued a certification within the prescribed period, the Commission

does not possess a roving mandate to decide that substantive aspects of state-imposed conditions are inconsistent with the terms of § 401.

## B. *The Federal Power Act*

■ Independent of FERC's concerns that Vermont's § 401 conditions violate the terms of the CWA, the Commission contends that the § 401 conditions run afoul of the FPA. The Commission primarily fears that "to accept the conditions proposed would give the state the kind of governance and enforcement authority that is critical and exclusive to the Commission's responsibility to administer a license under the Federal Power Act, a power the Courts have repeatedly concluded belongs exclusively to the Commission." Brief of the Fed. Energy Regulatory Comm'n at 16. In particular, FERC argues (1) that the conditions that impose deadlines on construction conflict with § 13 of the FPA, 16 U.S.C. § 806, which places construction deadlines largely within the discretion of the Commission and generally contemplates that construction will be commenced within two years of the date of the license, *see First Iowa Hydro–Elec. Co-op. v. Federal Power Comm'n*, 328 U.S. 152, 168 n. 13, 66 S.Ct. 906, 913 n. 13, 90 L.Ed. 1143 (1946); (2) that the reopener conditions and pre-approval conditions violate § 6 of the FPA, 16 U.S.C. § 799, which provides that a license, once issued, "may be revoked only for the reasons and in the manner prescribed under the provisions of this chapter, and may be altered or surrendered only upon mutual agreement between the licensee and the Commission," as well as other provisions of the FPA, *see* 16 U.S.C. §§ 803(b), 820, 823b; and, (3) more generally, that the conditions "eviscerate[ ] th[e] carefully balanced approach" to environmental concerns expressed in the Electric Consumers Protection Act ("ECPA"), Pub.L. No. 99–495, 100 Stat. 1243 (1986), amending the FPA, *see, e.g.,* 16 U.S.C. §§ 797(e), 803(a), 803(j).

We have no quarrel with the Commission's assertion that the FPA represents a congressional intention to establish "a broad federal role in the development and licensing of hydroelectric power." *California v. Federal Energy Regulatory Comm'n,* 495 U.S. 490, 496, 110 S.Ct. 2024, 2028, 109 L.Ed.2d 474 (1990). Nor do we dispute that the FPA has a wide preemptive reach. *Id.* The CWA, however, has diminished this preemptive reach by expressly requiring the Commission to incorporate into its licenses state-imposed water-quality conditions. *See* 33 U.S.C. § 1341(a)(1). Although we are sympathetic to the Commission's suggestion that without the authority to reject states' conditions that are beyond the scope of § 401, the preemptive reach of the FPA may be narrowed at the will of the states, *see, e.g.,* Brief of Amici Curiae Edison Elec. Inst. at 14, the Commission's concerns are overblown.

The Commission fails to acknowledge appropriately its ability to protect its mandate from incursion by exercising the authority to refuse to issue a hydropower license altogether if the Commission concludes that a license, as conditioned, sufficiently impairs its authority under the FPA. *See, e.g., Escondido,* 466 U.S. at 778 n. 20, 104 S.Ct. at 2113 n. 20. If the Commission is concerned that the conditions imposed by a state "intrude[ ] upon the Commission's exclusive authority under the FPA," Brief of the Fed. Energy Regulatory Comm'n at 44, nothing in the CWA prevents it from protecting its field of authority by simply refusing to issue the license as so conditioned.

The Commission, however, has chosen to forgo this route, arguing that refusing to issue a license is not a "practical option" in relicensing cases, such as CVPS. *Id.* at 20 n. 10. Although we understand that refusing to relicense a hydroelectric project would result in the disassembly of the project, presenting "serious practical and economic problems" and affecting all manner of local interests, *id.,* the Commission's dissatisfaction with the remedy of license denial is not reason enough to turn a blind eye to FERC's assumption of authority to review and reject a state's § 401 conditions. Rather, the Commission must establish that the authority it proposes is rooted in a Congressional mandate. And this they have failed to do.

Finally, with respect to the ECPA amendments to the FPA, the Commission is mistaken. Under these provisions, the Commission

must "give equal consideration to ... the protection, mitigation of damage to, and enhancement of, fish and wildlife ... and the preservation of other aspects of environmental quality," 16 U.S.C. § 797(e), and must impose conditions, based on recommendations of relevant federal agencies and affected states, to "protect, mitigate damages to, and enhance, fish and wildlife ... affected by the development, operation, and management of the project ...," 16 U.S.C. § 803(j)(1). *See United States Dep't of Interior v. Federal Energy Regulatory Comm'n*, 952 F.2d 538, 543 (D.C.Cir.1992) (describing environmental aspects of the ECPA amendments). The Commission argues that absent the authority to reject state-imposed conditions beyond the scope of § 401 of the CWA, the carefully balanced approach of the ECPA amendments, in general, and § 10(j), 16 U.S.C. § 803(j), in particular, would be "eviscerat[ed] ... through the simple expedient of [states'] labeling ... recommendations 'conditions' to the Section 401 certification." Brief of the Fed. Energy Regulatory Comm'n at 39. In short, the Commission is concerned that it would be "held hostage" to every state imposed condition, compromising its role under the ECPA amendments of reconciling competing interests. *Id.* Such a result, the Commission contends, is impermissible under § 511(a) of the CWA, 33 U.S.C. § 1371(a), which provides, in part, that the Act "shall not be construed as ... limiting the authority or functions of any officer or agency of the United States under any other law or regulation not inconsistent with this chapter...."

The Commission's claim that the CWA—as we construe it—and the ECPA amendments are incompatible must be rejected. The Commission's concern that states will hold the Commission hostage through the § 401 process is misplaced because states' authori-

ty under § 401 is circumscribed in notable respects. First, applicants for state certification may challenge in courts of appropriate jurisdiction any state-imposed condition that exceeds a state's authority under § 401. In so doing, licensees will surely protect themselves against state-imposed *ultra vires* conditions. Second, even assuming that certification applicants will not always challenge *ultra vires* state conditions, the Commission may protect its mandate by refusing to issue a license which, as conditioned, conflicts with the FPA. In so doing, the Commission will not only protect its mandate but also signal to states and licensees the limits of its tolerance. Third, and most important, to the extent that the existence of states' authority to impose § 401 conditions may otherwise conflict with the ECPA amendments, the ECPA is inconsistent with the terms of the CWA, thus, making inapplicable § 511(a) of the CWA. *See* 33 U.S.C. 1371(a) (the Act "shall not be construed as ... limiting the authority or functions of any officer or agency of the United States under any other law or regulation not inconsistent with this chapter ...").

### III. CONCLUSION

We have considered the Commission's remaining arguments and find them to be without merit. For the foregoing reasons, we grant the petition for review, vacate the orders of the Commission, and remand for proceedings consistent with this opinion.