## BANGOR HYDRO–ELECTRIC COMPANY, ET AL.

### v.

## BOARD OF ENVIRONMENTAL PROTECTION.

Supreme Judicial Court of Maine.

Argued May 1, 1991.
Decided July 30, 1991.

---

Michael E. Carpenter, Atty. Gen., Thomas Harnett, Asst. Atty. Gen. (orally), Augusta, for appellant.

Jeffrey D. Thaler, Berman, Simmons & Goldberg, Lewiston, Joanne Freund Lesher, Boston, Mass., Todd R. Burrowes, Falmouth, for Amici Curiae Conservation Law Foundation, Maine Audubon Soc.

Robert G. Dreher, Deborah S. Smith, Sierra Club Legal Defense Fund, Inc., Washington, D.C., for amici curiae Atlantic Salmon Federation, American Rivers, and Sierra Club.

Virginia E. Davis (orally), John P. McVeigh, Joseph Donahue, Preti, Flaherty, Beliveau & Pachios, Augusta, for appellee.

Gordon H.S. Scott (orally), Eaton, Peabody, Bradford & Veague, Augusta, for Nat. Hydropower Assoc.

William Laubenstein, Sarah Verville, Augusta, for intervenor Central Maine Power Co.

Before ROBERTS, WATHEN, GLASSMAN, CLIFFORD and COLLINS, JJ.

ROBERTS, Justice.

The Board of Environmental Protection (the Board) appeals from a judgment of the Superior Court (Kennebec County, *Alexander, J.*) vacating the Board's denial of water quality certification for the Milford Hydroelectric Project (the Project) operated by Bangor Hydro–Electric Company (Bangor Hydro) on the Penobscot River. The principal issue on appeal is whether the Board exceeded its authority under the water classification statute, 38 M.R.S.A. § 464(4)(F)(3) (1989),[1] in seeking to examine the fish passage and recreation facilities planned to meet designated uses, rather than limiting its certification to the Project's compliance with numerical standards for water chemistry. We hold that the Board's requests for information did not go beyond the scope of the water quality standards then applicable to the Penobscot River. 38 M.R.S.A. § 465(4) (1989).[2]

---

1. At the time of Bangor Hydro's application for water quality certification the water classification statute provided in pertinent part:

 (3) the board may only issue a discharge license pursuant to section 414–A or approve water quality certification pursuant to the United States Clean Water Act, Section 401, Public Law 92–500, as amended [33 U.S.C.A. § 1341] if the standards of classification of the water body and the requirements of this paragraph will be met.

 38 M.R.S.A. § 464(4)(F)(3) (1989). Subsequent amendments to this provision are not applicable to Bangor Hydro's petition. 1 M.R.S.A. § 302 (1989).

2. At the time of Bangor Hydro's application the Penobscot's waters were designated as Class C in the vicinity of the Project. 38 M.R.S.A. § 467(7)(A)(1) (1989). The water quality standards for Class C water were as follows:

 **4. Class C waters.** Class C shall be the 4th highest classification.

 A. Class C waters shall be of such quality that they are suitable for the designated uses of drinking water supply after treatment; fishing; recreation in and on the water; industrial process and cooling water supply; hydroelectric power generation, except as prohibited under Title 12, section 403; and navigation; and as a habitat for fish and other aquatic life.

 B. The dissolved oxygen content of Class C water shall be not less than 5 parts per million or 60% of saturation, whichever is higher, except that in identified salmonid spawning areas where water quality is sufficient to ensure spawning, egg incubation and survival of early life stages, that water quality sufficient for these purposes shall be maintained. Between May 15th and September 30th, the number of Escherichia coli bacteria of human

Bangor Hydro supplied some of this information too late to allow review and never supplied other portions of it. Accordingly, we vacate the judgment of the Superior Court and reinstate the Board's order denying certification without prejudice to Bangor Hydro's right to reapply.

## I.

This litigation arises from Bangor Hydro's efforts to obtain a new, forty-year operating license for the Project from the Federal Energy Regulatory Commission (FERC) to replace a license that expired on December 31, 1990.[3] While FERC is the licensing authority under the Federal Power Act, 16 U.S.C.A. § 797(e) (Supp.1991), the state must provide certification of compliance with its water quality standards under section 401(a) of the Federal Water Pollution Control Act, 33 U.S.C.A. § 1341(a)(1986), as a prerequisite to the issuance of a license. State resource agencies also provide consultation to support FERC's decision. *See* 16 U.S.C.A. § 803(j) (Supp.1991).

In December, 1986 Bangor Hydro began the consultations with state agencies required for FERC relicensing. The Department of Environmental Protection (DEP) commented that the Project currently met the Class C water chemistry standards and that Bangor Hydro should coordinate its impact studies with other agencies. The Atlantic Sea Run Salmon Commission, Department of Inland Fisheries and Wildlife, Department of Marine Resources, and Penobscot Indian Nation expressed continu-

ing concerns about plans for anadromous fish passage facilities and about the impact of the Project on water quality in the Stillwater River. These concerns remained unresolved after Bangor Hydro's second stage of consultation and meetings with the agencies in March, 1988 and November, 1988. The Penobscot Indian Nation also raised concerns about the Project's impact on recreational access to the river. On March 31, 1989 FERC accepted Bangor Hydro's relicensing application for processing subject to the provision that additional information would be furnished within 180 days on thirteen topics identified from state agency comments. Bangor Hydro was required to submit this additional information to the Board as well as to FERC.

On December 28, 1988 Bangor Hydro filed with the Board the application for state water quality certification that led to this appeal. The application relied entirely upon Bangor Hydro's FERC relicensing application to describe planned water quality protection measures. DEP circulated the certification application to the state agencies, which reiterated the concerns they had raised in the FERC consultations. On August 1, 1989 DEP forwarded these agency comments to Bangor Hydro, requesting response within thirty days. After receiving an extension to October 31, Bangor Hydro finally filed its response to the agency comments on November 13, 1989. At the same time Bangor Hydro filed a partial response to the FERC information request, due September 30. In its response Bangor

---

origin in these waters may not exceed a geometric mean of 142 per 100 milliliters or an instantaneous level of 949 per 100 milliliters. The department shall promulgate rules governing the procedure for designation of spawning areas. Those rules shall include provision for periodic review of designated spawning areas and consultation with affected persons prior to designation of a stretch of water as a spawning area.

**C.** Discharges to Class C waters may cause some changes to aquatic life, provided that the receiving waters shall be of sufficient quality to support all species of fish indigenous to the receiving waters and maintain the structure and function of the resident biological community.

38 M.R.S.A. § 465(4) (1989). The river has since been upgraded to Class B in the vicinity of the Project. 38 M.R.S.A. § 467(7)(A)(4) (Supp. 1990).

3. Bangor Hydro simultaneously sought the Board's approval under the Maine Waterway Development and Conservation Act, 38 M.R.S.A. §§ 630–637 (1989 & Supp.1990) (MWDCA) to install an additional turbine in the Project. The Board tabled the MWDCA permit application pending resolution of the water quality certification issue and that application is not before us. We note that the Public Utilities Commission granted its approval for this expansion in a separate proceeding. *Bangor Hydro–Electric Co. v. Public Utilities Commission*, 589 A.2d 38, 40 n. 2 (Me.1991).

Hydro requested an additional sixty days to provide its plans for fish passage facilities and an indefinite postponement of its study of the Stillwater River.

DEP notified Bangor Hydro that there was insufficient information for water quality certification and insufficient time to review the submittals before certification would be waived under a one year federal deadline. Bangor Hydro declined to withdraw its application and resubmit it to restart the one year review period. On December 13, 1989 the Board met and voted unanimously to deny water quality certification without prejudice to Bangor Hydro's right to reapply. Bangor Hydro filed a timely appeal in the Superior Court where two additional parties, Central Maine Power Company and the National Hydropower Association, were granted leave to intervene on the issue of federal preemption of the Board's authority. The court agreed with Bangor Hydro's arguments and ordered that the Board issue water quality certification. The court also entered a declaratory judgment limiting the scope of certification to the numerical water quality standards of section 465(4)(B). This appeal followed.

## II.

The water standards for each class of Maine waters contain three parts: a list of designated uses, a set of numerical criteria for water chemistry (dissolved oxygen and bacteria counts), and a set of narrative criteria on the permissible level of pollutant discharges. *See* 38 M.R.S.A. § 465(4)(A), (B), & (C). For Class C waters the designated uses include fishing, recreation, and habitat for fish and other aquatic life, in addition to hydroelectric power generation. The statute provides that the waters "shall be of such quality that they are suitable for the designated uses...." *Id.* § 465(4)(A).

Bangor Hydro contends that there is an irrebuttable presumption that waters are "suitable for" their designated uses if they meet the numerical criteria of section 465(4)(B) and that the Board has no charter to inquire whether the designated uses actually exist, or can exist, in a river. We disagree.

In interpreting a statute we seek first to ascertain the real purpose of the legislation, *State v. Niles,* 585 A.2d 181, 182 (Me.1990), discerning this purpose if possible from the plain meaning of the language. *Paradis v. Webber Hospital,* 409 A.2d 672, 675 (Me.1979). We cannot conclude that the designated uses included in section 465 are mere surplusage. The level of detail bespeaks a considered determination of the public interest. This legislative determination would be rendered a nullity if the agency responsible for reviewing compliance could consider only the numerical criteria and not whether the designated uses actually were achieved in a particular river.[4] Although there may be some ambiguity in the requirement that waters be "suitable for" the designated uses, we conclude that this language contemplates that the designated uses actually be present. Our interpretation is reinforced by the legislative history, which reveals an intent that designated uses "are supported" in water meeting the classification standards. *See* Report of the Joint Standing Committee on Energy and Natural Resources, on Water Reclassification 6, 10, 80 (March, 1986) (hereinafter *Committee Report*).

The classification statute recognizes that all water quality standards may not be achieved at a given time and includes the intent "where water quality standards are not being achieved, to enhance water quality." 38 M.R.S.A. § 464(1) (1989).[5] The designated uses provide goals for the

---

4. Focusing solely on the numerical criteria also would ignore the statute's narrative criteria, which include a requirement for waters "of sufficient quality" to support all indigenous fish species, 38 M.R.S.A. § 465(4)(C) (1989), separately defined to include those species that historically were present. *Id.* § 466(8). The statutory statement of purpose suggests the intent to

include the narrative criteria as an integral part of the water quality standards that the Board must consider in its review. *Id.* § 464(1)(C).

5. *See Committee Report* at 5 ("resolve of Legislature to improve, where appropriate, the waters of the State over the course of time").

state's management of its classified waters.[6] We hold that it is proper for the Board to consider such goals in reviewing a forty year license for compliance with the classification standards pursuant to section 464(4)(F)(3).[7]

■ We need not decide in this appeal to what extent the Board may condition water quality certification upon measures designed to promote the future attainment of designated uses. In the present posture of Bangor Hydro's application the Board has merely sought information about its planned mitigation measures. Those measures clearly bear on the attainment of the designated uses of fishing, recreation, and fish habitat. Based upon the concerns raised by several agencies on the record, the Board had adequate evidence to support a conclusion that such information should be included in its certification review. *See Gulick v. Board of Envtl. Protection*, 452 A.2d 1202, 1209 (Me.1982). Because Bangor Hydro did not provide the information within the time allotted for review the Board properly denied certification. *Long Lake Energy Corp. v. New York State Department of Envtl. Conservation*, 164 A.D.2d 396, ——, 563 N.Y.S.2d 871, 875–76 (N.Y.App.Div.1990).

### III.

■ The arguments of Bangor Hydro and the intervenors that Board action is preempted by FERC's broad jurisdiction likewise is pretermitted by the preliminary nature of the Board's denial. In the overlapping schemes of the Federal Power Act and the Federal Water Pollution Control Act, the Board's veto is confined to the narrow question whether there is a reasonable assurance that the Project will comply with state water quality standards. *Arnold Irrigation Dist. v. Department of Envtl. Quality*, 79 Or.App. 136, 140–41, 717 P.2d 1274, 1278 (1986); *Power Auth. v.*

*Williams*, 60 N.Y.2d 315, 324–27, 457 N.E.2d 726, 729–30, 469 N.Y.S.2d 620, 624 (1983). But the Board's information requirements were based upon designated uses that we hold are an integral part of the state water quality standards. The Board was within its jurisdiction in reviewing Bangor Hydro's measures for future compliance with those standards under section 401(a) of the Federal Water Pollution Control Act, 33 U.S.C.A. § 1341(a)(1986). Because the Board has had no opportunity to set any conditions of certification the question whether it has exceeded its jurisdiction under section 401(d), 33 U.S.C.A. § 1341(d), is not before us.

■ Bangor Hydro also contends that its right to due process was violated because the Board never requested the information that Bangor Hydro failed to provide. The record reveals two years of preliminary consultations in which several state agencies raised concerns about the details of the planned fish passage facilities and the Project's long term impact on the Stillwater River. Bangor Hydro's application for water quality certification relied almost entirely upon its FERC relicensing application for technical detail. Both the FERC information request of March, 1989 and the certification comments of August, 1989 reiterated the prior state agency comments. Bangor Hydro had ample notice of the state's concerns and must have known that section 401(a), 33 U.S.C.A. § 1341(a), required a certification decision by December, 1989. As the applicant Bangor Hydro had the duty to provide the requested information in time to enable review. Its submittals were made just before the deadline and much of the required information never was provided. We conclude that Bangor Hydro's due process argument is without substance. No other issue raised by Bangor Hydro in this appeal merits further discussion.

---

6. *See Committee Report* at 6 (classification serves purpose of establishing water quality goals); Joint Standing Committee on Energy and Natural Resources, hearing on L.D. 1503, at 3 (May 20, 1985) (testimony of H. Warren, DEP Commissioner) (classification is goal oriented as required by federal Clean Water Act).

7. The Project's compliance with the state anti-degradation policy, section 464(4)(F)(1), is not challenged.

The entry is:

Judgment vacated.

Case remanded with direction to enter a judgment affirming the decision of the Board of Environmental Protection.