STATE OF MAINE

CUMBERLAND, ss.

SUPERIOR COURT
CIVIL ACTION
DOCKET NO. AP-03-70
RAC-CUM-5/4/2004

S.D. WARREN COMPANY,

Petitioner

v.

ORDER

MAINE DEPARTMENT OF
ENVIRONMENTAL PROTECTION,

Respondent

STATE OF MAINE
Cumberland, ss, Clerk's Office
SUPERIOR COURT

MAY 04 2004

RECEIVED

DONALD

MAY 19 2004

Before this court is Petitioner, S.D. Warren Company's ("Warren") appeal from the October 2, 2003, decision of Respondent, Maine Board of Environmental Protection ("BEP"), pursuant to M.R. Civ. P. 80C.

## FACTS

Petitioner Warren owns and operates the Dundee, Gambo, Little Falls, Mallison Falls and Saccarappa hydroelectric generating dam projects (the "Projects") located on the Presumpscot River. "The Projects have a combined generating capacity of 7,450 kW and are operated to provide electricity to Petitioner Warren's Westbrook paper mill." (R. 278 at 1.) The Projects are operated in the "run-of-river" mode, meaning that outflow from each Project is approximately equal to inflow on an instantaneous basis during normal operating conditions. (R. 259 at 3.)

All of the Projects were constructed in the 1900s and were originally licensed by the Federal Energy Regulatory Commission ("FERC") in separate actions between

October 31, 1979 and September 17, 1981. Id. The original expiration dates for these licenses ranged from October 1, 1999 to September 1, 2001. Accordingly, in 1996, at Petitioner Warren's request, the licenses were modified to all expire on January 26, 2001.

On January 14, 1999, Petitioner Warren field applications for the continued operation of each of the Projects. Certification was also requested in conjunction with Petitioner Warren's Application with FERC for each of the Projects. The applications for certification were subsequently withdrawn and submitted again on January 12, 2000, January 11, 2001, and December 20, 2002. (R. 178-181.)

The Department of Environmental Protection ("DEP") issued its Order in April 2003, approving the applications of Petitioner Warren and granting certification subject to several conditions.[1] Consequently, Petitioner Warren appealed the Order to the BEP on May 29, 2003. Five months later, the BEP denied Petitioner Warren's appeal. Therefore, on October 31, 2003, Petitioner Warren filed this appeal with the Cumberland County Superior Court, pursuant to M.R. Civ. P. 80C.[2] Subsequently, on January 26, 2004, this court granted American Rivers and Friends of the Presumpscot River's Motion to Intervene.

---

[1] These conditions included restrictions on water levels and flows, requirements that Petitioner Warren avoid maintenance drawdowns of project impoundments during May and June, install upstream eel passage facilities within two years following the issuance of the FERC license, institute operation measures to provide downstream eel passage, install and operate upstream and downstream anadromous fish passage facilities, institute spillage of 50 cfs at the Dundee Dam and 100 cfs at the Gambo Dam in order to meet Class B dissolved oxygen ("DO") standards in the river, and develop and implement a recreational facility enhancement plan for each project. (R. 278.)

[2] In footnote three in Petitioner Warren's reply brief, it requests that this court modify the record to include the audiotape of this hearing, pursuant to M.R. Civ. P. 80C(f). The tapes in question, however, are not required to be kept and contain thoughts of BEP members that would not be necessary to complete the record in this case. Therefore, this court denies Petitioner Warren's motion to modify and grants the BEP's motion to strike footnote 3. See Murphy v. Board of Environmental Protection, 615 A.2d 255, 260 (holding that "{t]he Administrative Procedure Act leaves it to the discretion of the trial court to determine whether additional evidence is necessary to complete the record.").

# DISCUSSION

## A. Standard of Review

Petitioner Warren argues that this court should review the decision of the BEP *de novo*. Conversely, however, the BEP asserts that its decision should be given deference appropriate to its professional and technical expertise.

When a decision of an administrative agency is appealed pursuant to M.R. Civ. P. 80C, this court reviews "the agency's decision directly for abuse of discretion, errors of law, or findings not supported by the evidence." Centamore v. Dep't of Human Services, 664 A.2d 369, 370 (Me. 1995) (citation omitted). The focus of the appeal is not whether the court would have reached the same conclusion as the agency, but whether the record contains competent and substantial evidence, which supports the result, reached by the agency. CWCO, Inc. v. Superintendent of Ins., 1997 ME 226, ¶ 6, 703 A.2d 1258, 1261. Deferential review requires this court to uphold the orders of the BEP if they are based on "such relevant evidence as a reasonable mind might accept as adequate to support a conclusion." In re Maine Clean Fuels, Inc., 310 A.2d 736, 741 (Me. 1973).

Here, the BEP is a volunteer board. Despite this, however, the DEP and the BEP regularly administer the laws in question. Consequently, this court will not "attempt to second-guess the agency on matters falling within its realm of expertise and [instead will] limit our review to determining whether the agency's conclusions are unreasonable, unjust or unlawful in light of the record." Imagineering v. Department of Professional & Financial Regulation, 593 A.2d 1050, 1053 (Me. 1991); Isis Development, LLC. V. Town of Wells, 2003 ME 149, ¶ 3, n. 4, 836 A.2d 1285. Accordingly, it is necessary for this court to deferentially review the BEP's decision in this case.

## B. Does the Clean Water Act Require Certification?

Petitioner Warren contends that the BEP's decision, holding that the Projects require water quality certification under the Clean Water Act ("CWA"), was in error.

The CWA provides, in part that "[a]ny applicant for a Federal license or permit to conduct any activity . . . which may result in any discharge into the navigable waters, shall provide the licensing or permitting agency a certification from the State in which the discharge originate or will originate . . ." 33 U.S.C. § 1341(a)(1) (2004). "The term 'discharge' when used without qualification includes a discharge of a pollutant, and a discharge of pollutants. Id. at § 1362(16).

The D.C. Circuit has determined that the term "discharge" contemplates the addition of something to the water source. North Carolina v. FERC, 112 F.3d 1175, 1187 (D.C. Cir. 1997);[3] Alabama Rivers Alliance v. FERC, 325 F.3d 290 (D.C. Cir. 2003) (holding that certification was required when replacement of several turbines resulted in an increased flow of water through a dam.) In addition, the Supreme Court has held that once the certification requirement is triggered by a "discharge" then the certification conditions are not limited to addressing merely the physical quality of the water, but can also require implementation of state water quality standards under the expansive language of § 401(d). PUD No. 1 of Jefferson County v. Washington Department of Ecology, 511 U.S. 700, 711 (1994).

In the case at bar, the "run-of-river" operation will be maintained at each Project site. (R. 277 at 91-93.) The Projects, however, will require the rerouting of the natural flow of the river. This court finds that this rerouting of the water constitutes a "discharge" under the CWA. See PUD No. 1, 511 U.S. at 711.

---

[3] This court notes that the D.C. Circuit Court addressed whether a mid-term license amendment request triggered Section 401 certification by a bordering state, which is an entirely different issue than the one presented in this case. See North Carolina, 112 F.3d at 1176.

Next, Petitioner Warren argues that even if a "discharge" does occur it will not contain pollutants, therefore no certification is required under the CWA. Although not binding on this court, this court finds the decisions of sister states on this issue to be instructive and, in this case, persuasive.

The Ninth Circuit Court of Appeals has held that:

> [d]ischarge is the broader term because it includes all releases from point sources, whether polluting or nonpolluting. The D.C. Circuit reached this conclusion in National Wildlife Fed'n v. Gorusch, 224 U.S. App. D.C. 41, 693 F.2d 156 (D.C. Cir. 1982). There the court interpreted discharge in section 1362(16) of the Act to include the release from a point source of turbid water that did not contain any pollutant. This is the logical interpretation of § 1362(16) that comports with the structure and lexicon of the Clean Water Act.

Oregon Natural Desert Ass'n v. Dombeck, 172 F.3d 1092, 1098 (9th Cir. 1998), cert. denied, 528 U.S. 964 (1999). In addition, the Supreme Court of New York has held that:

> [t]his broad definition of the word "discharge" and its application to "any discharge" in section 401 of the FWPCA requires that we reject petitioner's fundamental argument, i.e., that for section 401 to apply, a discharge must contain a specific and identifiable pollutant. In rejecting that argument, we further note that such an interpretation advances the FWPCA's purpose of insuring the rights of States to eliminate conditions of pollution (see U.S. Code, tit 33, § 1251, subd [b]), including pollution arising from causes other than specific discharges of identifiable pollutants (see US Code, tit 33, § 1314, subd [f], par [2]). para.)

Power Auth. v. Williams, 475 N.Y.S.2d 901, 904 (1984). Therefore, this court finds that certification is required by the CWA, despite the possible nonexistence of pollutants in the "discharge."

Finally, Petitioner Warren opines that even if the Projects will result in a discharge of a pollutant, the "discharge" will not result from the continued operation of the Projects, so certification is not required. The CWA, however, provides that any applicant for a license, which would result in "any discharge," needs to obtain water

quality certification. Here, a "discharge" will occur, despite the continued operation of the Projects. Hence, this court finds the BEP's decision, requiring Petitioner Warren to obtain water quality certification, correct as a matter of law.

## C. Certification Conditions

The water quality certification in question requires that the Projects maintain seasonally varied minimum flows, install upstream and downstream eel passage, install fish passage facilities, and develop and implement a recreational facility enhancement plan for each project. Petitioner Warren asserts that all of these requirements are void, because the BEP cannot impose conditions to enhance or expand the size of the aquatic habitat. Petitioner Warren also contends that as long as some part of the water attains or supports the designated uses, the water quality standard is being met.

The CWA requires States that issue water quality certifications to impose "limitations" necessary to assure compliance with the State's water quality standards. 33 U.S.C. § 1341(d) (2003). The Law Court has held that when issuing a water quality certification, the State must determine whether all three parts of the Maine water quality standards are met; the designated uses, the numerical criteria for water chemistry and the narrative criteria. <u>Bangor Hydro-Electric Co. v. Board of Environmental Protection</u>, 595 A.2d 438, 442 (Me. 1991). Where water quality standards are not being met, the designated uses "provide goals for states management of its classified waters." <u>Id</u>. Furthermore, conditions requiring fish passage and recreational facilities to be installed "clearly bear on the attainment of the designated uses of fishing, recreation, and fish habitat." <u>Id</u>. at 433.

## 1. Bypass Reach Minimum Flows

The Maine Water Classification Program provides that "[t]he Legislature intends by passage of this article to establish a water quality classification system which will

allow the State to manage its surface waters so as to protect the quality of those waters and, where water quality standards are not being achieved, to *enhance* water quality." 38 M.R.S. § 464(1) (2003) (emphasis added).

Here, the BEP held that increased flows in the bypass reach are necessary to provide reasonable assurance that the waters will be of sufficient quality to support all aquatic species indigenous to these waters without detrimental changes in the resident biological community. (R. 278 at 6-7.) There is ample evidence in the record to support the BEP's finding that the DEP had authority to restore the previously expired fish species and increase the population and habitat of the existing species. (R. 259); (R. 136 at 70.) Accordingly, based on a totality of the circumstances, this court finds that the BEP's conclusions regarding minimum flows are not clearly erroneous. See Bangor Hydro-Electric Co., 595 A.2d at 442-43 (holding that "[t]he designated uses provide goals for the state's management of its classified waters. We hold that it is proper for the Board to consider such goals in reviewing a forty year license for compliance with the classification standards . . . "); PUD No. 1, 511 U.S. 700 (upholding state water quality certification requirement that a dam owner provide minimum flows to protect fish in the bypass).

### 2. Upstream and Downstream Eel Passage

The Law Court has held that fish passage measures contained in a certification for the relicensing of a hydroelectric project, "clearly bear on the attainment of the designated uses of fishing, recreation, and fish habitat." Bangor Hydro-Electric Co., 595 A.2d at 443.

In this case, the BEP found that the upstream and downstream eel passage conditions were "necessary to ensure that the project waters will be suitable for the designated uses of fishing and habitat for fish, and that the project waters will be of

7

sufficient quality to support all species of fish indigenous to these waters, subject to the other provisions of the order." (R. 278 at 7.) This court finds that the upstream and downstream eel requirements are supported by substantial evidence in the record. Specifically, the DEP found that while there is evidence that "eel migration and thus overall eel populations would benefit from the installation of upstream passage facilities at each dam, because more eels will successfully pass the dams to reach Sebago Lake with fishways in place than without fishways." (R. 259 at 17-18.) Also, there exists substantial evidence in the record that the dams are affecting the downstream eel passage as well. (R. 174 at 94-98.) Therefore, this court concludes that the BEP's conclusions are based on adequate evidence and are not an abuse of discretion.

### 3. Fish Passage

"The Legislature declares that it is the State's objective to restore and maintain the chemical, physical and biological integrity of the State's waters and to preserve certain pristine state waters." 38 M.R.S. § 464(1) (2003). "The Legislature further declares that in order to achieve this objective the State's goals are: [t]hat water quality be sufficient to provide for the protection and propagation of fish, shellfish and wildlife and provide for recreation in and on the water." Id. at § 464(1)(C). In addition, Class B and C waters are required to be of such quality that they are suitable "as a habitat for fish and other aquatic life." Id. at §§ 465(3)(A) and (4)(A). Class B and C waters also must "be of sufficient quality to support all aquatic species indigenous to the receiving water without detrimental changes in the resident biological community." Id. at §§ 465(3)(C) and 4(C).

Here, the record supports the BEP's finding that "phased installation of upstream and downstream anadromous fish passage facilities at each of the project dams is necessary to ensure that the project waters will be suitable for the designated uses of

fishing and habitat for fish, and that the project waters will be of sufficient quality to support all species of fish indigenous to these waters . . ." (R. 278 at 7); (R. 259 at 10-11.) Consequently, this court finds that the BEP's condition regarding fish passage was not clearly erroneous, since "all aquatic species indigenous to the receiving water" should be supported. 38 M.R.S.A. § 465(3)(C) (2003); Bangor Hydro-Electric Co., 595 A.2d at 433.

### 4. Recreational Facilities

Class B and C waters "shall be of such quality that they are suitable for the designated uses of . . . recreation in and on the water." 38 M.R.S. §§ 465(3)(A) and (4)(A) (2003). In this case, the record adequately supports this determination. (R. 259 at 24-25.) More specifically, the BEP correctly found that Petitioner Warren's dams have eliminated the opportunity for fishing and prevented recreational access in the areas of the river. (R. 278 at 7-9.) Accordingly, this court concludes that the BEP's decision was not erroneous or an abuse of discretion. See Bangor Hydro-Electric Co., 595 A.2d at 442.

### D. Antidegradation Policy

Next, Petitioner Warren asserts that the BEP violated the State's antidegradation policy by failing to consider and address the impact of these above conditions on the use of hydroelectric power generation.

"Existing in-stream water uses and the level of water quality necessary to protect those existing uses must be maintained and protected." 38 M.R.S. § 464(4)(F)(1) (2003). The BEP has broad latitude to place restrictions on Warren's licensed activity to assure compliance with state water quality standards and any other appropriate requirement of state law. PUD No. 1, 511 U.S. at 715; 33 U.S.C. § 1341(d) (2003).

In the case at bar, the Order provides that the minimum bypass flows, spillage flows and fish passage facilities required by the Order will reduce average annual

generation from 40.5 million to 34.5 million kWh. (R. 259 at 27.) Even though hydropower generation will be reduced, this court finds that it will still be "maintained and protected" as required by the state's antidegradation policy. Furthermore, this court notes that hydropower is just one of the many designated and existing uses that must be protected in the subject waters. 38 M.R.S. § 464(4)(F) (2003). Thus, this court finds that this slight reduction in the average generation will not violate the state's antidegradation policy.

### E. Rulemaking

Petitioner Warren also asserts that the BEP's reliance on the Bureau of Land and Water Quality's Hydropower Project Flow and Water Level Policy, absent rulemaking, ("Water Level Policy") was inappropriate.

> Rule means the whole or any part of every regulation, standard, code, statement of policy, or other agency statement of general applicability, including the amendment, suspension or repeal of any prior rule, that is or is intended to be judicially enforceable and implements, interprets or makes specific the law administered by the agency, or describes the procedures or practices of the agency.

5 M.R.S. § 8002(9) (2003). "The term does not include [a]ny form, instruction or explanatory statement of policy which in itself is not judicial enforceable, and which is intended solely as advice to assist persons in determining, exercising or complying with their legal rights, duties or privileges." Id. at § 8002(9)(B)(4). The Law Court has held that "[a]n agency may provide guidance for its employees and the public without adopting the guiding materials as rules, as long as those materials are not intended to have, and are not given, the force and effect of law. Downeast Energy Corporation v. Fund Insurance Review Board, 2000 ME 151, ¶ 23, 756 A.2d 948, 953.

Here, the policy provides that:

In determining flows and water levels at hydropower projects, the Bureau of Land and Water Quality will operate under the rebuttable presumption that a flow providing wetted conditions in a weighted average of 3/4ths of the cross-sectional area of the affected river or stream, as measured from bank full conditions, or a water level that provides wetted conditions for 3/4ths of the littoral zone of a lake or pond, as measured from full pond conditions, will be needed to meet aquatic life and habitat standards.

(R. 218.) Although the DEP may have used this presumption in making its conclusions, the BEP determined that "the Department did not base its minimum flow determinations on meeting a wetted width requirement . . ." (R. 278 at 12.) This analysis is supported by substantial evidence in the record, because the DEP did not *require* the rewatering of 3/4ths of the width of the bypass channels in its decision. (R. 259 at 19-21.) Instead, the DEP considered many circumstances and established minimum flows for each project on a "case-by-case basis." Id. at 19; (R. 278 at 12.) Consequently, based on this analysis as well as 5 M.R.S.A. § 8002(9)(B)(4), this court finds that the BEP's decision was not clearly erroneous.

### F. Dissolved Oxygen Criterion

Petitioner Warren further argues that the BEP erred in upholding the instantaneous dissolved oxygen ("DO") criterion. Specifically, Petitioner Warren contends the numeric water quality standard for DO contained in 38 M.R.S.A. § 465(3)(B) should be interpreted as requiring a calculation based on a daily average not an instantaneous measurement.

"To determine the intent of the Legislature, we look first to the statute's plain meaning and, if there is ambiguity, we look beyond that language to the legislative history . . . ." Town of Eagle Lake v. Commissioner, Department of Education, 2003 ME 37, ¶ 7, 818 A.2d 1034, 1037 (citation and quotations omitted). "When interpreting statutes, the Court seeks to discern from the plain language the real purpose of the

legislation, avoiding results that are absurd, inconsistent, unreasonable, or illogical." Id. (quotations and citations omitted). "Further, we consider the whole statutory scheme for which the section at issue forms a part so that a harmonious result, presumably the intent of the Legislature, may be achieved." Id. (citations and quotations omitted).

In the present case, the statute provides, that the DO content "shall not be less than 7 parts per million or 75% of saturation, whichever is higher . . ." 38 M.R.S. § 465(3)(B) (2003). This court finds that this language is ambiguous as to whether or not this standard applies instantaneously or based on an average through out any given day. Accordingly, it is necessary to review the legislative history of this section.

Before 1973, the Maine Water Quality Law required that the DO content in Class B waters be not less than 75% of saturation and not less than 5 parts per million "at any time." (P.L. 1967, c. 475 § 4.) In 1973, however, the Legislature removed the words "at any time" from the standard. (P.L. 1973, c. 450 § 5.)

Despite this, however, reading the statute as requiring an "average" standard would lead to an unreasonable result. This is because, as the BEP found, "oxygen levels could in fact fall below the instantaneous minimum threshold of 5 parts per million needed to sustain fish for substantial periods of time during a given day, so long as the daily average DO level was 7 parts per million." (R. 278 at 114.); Town of Eagle Lake, 2003 ME 37, ¶ 7, 818 A.2d at 1037 (holding that the court should avoid absurd, inconsistent, unreasonable as well as illogical results.) Consequently, this court finds that the BEP's decision regarding the DO content was correct as a matter of law.

## G. Re-Opener Provisions

Petitioner Warren argues that the re-opener provisions contained in the BEP's decision are void.

12

The CWA provides that any certification "shall set forth any effluent limitations and other limitations, and monitoring requirements necessary to assure that any applicant for a Federal license or permit will comply" with the State's water quality standards. 33 U.S.C. § 1341(d) (2003). Moreover, the Second Circuit Court of Appeals has held that FERC did not have authority to reject state-imposed water quality certification conditions, including a broadly worded re-opener clause. American Rivers v. FERC, 129 F.3d 99, 111 (2nd Cir. 1997). In fact, FERC itself has taken the position that based on *American Rivers*, "a state may modify a water quality certification when the state has reserved such authority in the certification." Central Maine Power Co., 82 FERC 61,191 at 61,733 (February 26, 1998).

In the case at bar, the re-opener provisions contained in the DEP's decision are specific and are necessary to ensure that the state's water quality standards are met. In addition, the re-opener provisions allow for Petitioner Warren to receive notice and a hearing regarding any project modifications as well as an opportunity to appeal the final decision to the courts. (R. 278 at 19.) In sum, this court finds that the BEP's inclusion of these specific re-opener provisions was not clearly erroneous.

WHEREFORE, this court **DENIES** Petitioner Warren's appeal and **AFFIRMS** the decision of the BEP, pursuant to M.R. Civ. P. 80C.

Dated:May 4, 2004

Roland A. Cole
Justice, Superior Court

13

Date Filed __10-31-2003__ __Cumberland__ Docket No. __AP-03-70__

County

Action __80C Appeal__

S.D. WARREN COMPANY

MAINE DEPARTMENT OF ENVIRONMENTAL PROTECTION
AMERICAN RIVERS
FRIENDS OF THE PRESUMPSCOT RIVER

vs.

| Plaintiff's Attorney | Defendant's Attorney |
|---|---|
| Matthew D. Manahan, Esq.<br>Kate L. Geoffroy, Esq.<br>Pierce Atwood<br>One Monument Square<br>Portland, ME  04101<br>207-791-1100 | Ronald Kreisman Esq. (Amer. Rivers &<br>25 Page Street          Friends of Pre. Ri<br>Hallowell, ME 04347  626-0248<br><br>Carol Blasi, AAG (Me. Dept. of Env. Prot)<br>6 State House Station Augusta 04333<br><br>Sean Mahoney Esq. (Amer. Riv/Friends of<br>PO BOX 586          the Pre. River)<br>Portland ME 04112 |

Date of
Entry