2005 ME 27

**S.D. WARREN COMPANY**

v.

**BOARD OF ENVIRONMENTAL PROTECTION.**

Supreme Judicial Court of Maine.

Argued: Nov. 16, 2004.
Decided: Feb. 15, 2005.

Matthew D. Manahan, Esq. (orally), Catherine R. Connors, Esq., Pierce Atwood, LLP, Portland, for plaintiff.

G. Steven Rowe, Attorney General, Carol A. Blasi, Asst. Atty. Gen. (orally), Augusta, for defendant.

Sean Mahoney, Esq. (orally), Verrill & Dana, LLP, Portland, Ronald A. Kreisman, Esq., Hallowell, for intervenors American Rivers and Friends of the Presumscot River.

Panel: SAUFLEY, C.J., and CLIFFORD, RUDMAN, ALEXANDER, CALKINS, and LEVY, JJ.

RUDMAN, J.

[¶ 1] S.D. Warren Company appeals from a judgment entered in the Superior Court (Cumberland County, *Cole, J.*), affirming the decision of the Board of Environmental Protection (BEP) approving Warren's application for water quality certification pursuant to section 401 of the Clean Water Act (CWA) of 1972, 33

U.S.C.A. § 1341 (West 2001), and 38 M.R.S.A. § 464 (2001 & Supp.2004), subject to certain conditions imposed by the BEP pursuant to section 401(d) of the CWA. 33 U.S.C.A. § 1341(d). Warren asserts that the BEP's order should be reviewed de novo without deference to its legal interpretations; that the BEP exceeded its authority when it found that certification was required under the CWA; and that the BEP exceeded its authority when it imposed the specific conditions that it did. We disagree and affirm the judgment of the Superior Court.

## I. BACKGROUND

[¶ 2] Warren owns and operates five contiguous hydroelectric dam projects on the Presumpscot River in Cumberland County. The waters involved in Warren's projects are variously classified as Class A (from the outlet of Sebago Lake to its confluence with the Pleasant River, excluding Dundee Pond), Class B (from its confluence with the Pleasant River to Saccarappa Falls), Class C (from Saccarappa Falls to tidewater), and Class GPA (Dundee Pond). The projects have a combined generating capacity of 7450 kW and provide electricity for Warren's paper mill in Westbrook. The projects operate in the run-of-river mode.[1]

[¶ 3] All of the projects were constructed in the 1900s. The projects were originally licensed separately between 1979 and 1981. The licenses were to expire in 1999, but were modified in 1996 to continue until 2001. Applications for certification were filed in 1999, subsequently withdrawn and refiled in 2000, 2001, and 2002. In April of 2003 the Department of Environmental Protection (DEP) approved water quality certification for the continued operation of Warren's projects, subject to a number of conditions. In May of 2003 Warren filed a timely appeal from the DEP's decision to the BEP. The BEP adopted the findings of the DEP and affirmed the decision of the DEP in October of 2003. Warren appealed from the decision of the BEP to the Superior Court, which affirmed the decision of the BEP in May of 2004. Warren now appeals from that judgment.

## II. DISCUSSION

### A. Standard of Review

[¶ 4] We review decisions made by an administrative agency for errors of law, abuse of discretion, or findings of fact not supported by the record.[2] *Melanson v. Sec'y of State,* 2004 ME 127, ¶¶ 7–8, 861 A.2d 641, 643–44. When the Superior Court acts in an intermediate appellate capacity pursuant to M.R. Civ. P. 80C, we review that agency's decision directly. *Id.* "The administrative agency's interpretation of a statute administered by it, while not conclusive or binding on this court, will be given great deference and should be upheld unless the statute plainly compels a contrary result." *Thacker v. Konover,* 2003 ME 30, ¶ 14, 818 A.2d 1013, 1019 (citations and quotation marks omitted).

### B. Deference to BEP

[¶ 5] Warren asserts that the BEP is not entitled to deference when it inter-

1. The outflow of the project is approximately equal to the inflow on an instantaneous basis.

2. Title 38 M.R.S.A. § 341–D(4)(A) (2001) provides that the BEP is not bound by the findings of fact or conclusions of law made by the DEP, but may adopt, modify, or reverse those findings. In this case, all findings of fact and conclusions of law were initially made by the DEP and subsequently adopted by the BEP. Throughout the rest of this opinion, where findings of fact and conclusions of law are referenced, the reference pertains to the findings of fact and conclusions of law made or adopted by the BEP.

prets the CWA because it is interpreting federal law. We disagree. The BEP is accorded substantial deference when it interprets certain federal statutes. The rationale underlying our deference to BEP interpretations is that the BEP has greater expertise in matters of environmental concern and greater experience administering and interpreting those particular statutes. *See Maritime Energy v. Fund Ins. Review Bd.*, 2001 ME 45, ¶ 9, 767 A.2d 812, 814. The CWA, 33 U.S.C.A. §§ 1251–1387 (West 2001 & Supp.2004), concerns the environment and it is an act that the BEP has experience administering. In addition, both state and federal law contemplate that the BEP will administer and interpret section 401 for purposes of water quality certification.[3]

[¶ 6] Additionally, Warren argues that the BEP is a "lay board" and therefore not entitled to deference. We disagree. We have specifically rejected the proposition that a volunteer board is not entitled to deference. The standard is whether the subject matter is beyond the scope of the BEP's expertise. *Maritime*, 2001 ME 45, ¶ 9 n. 2, 767 A.2d at 814. In *Maritime*, we concluded that because the BEP relied on its expertise interpreting the statute it was charged with administering and relied upon its expertise in a field of environmental concern, the BEP's interpretation was entitled to deference. *Id.*

[¶ 7] In the present case, because the statutes involved are administered regularly by the BEP and because the subject matter is well within the BEP's expertise, the BEP's interpretations, although not conclusive or binding upon us, are entitled to great deference.

## C. State Certification

[¶ 8] It is the responsibility of the Federal Energy Regulatory Commission (FERC), pursuant to the Federal Power Act (FPA), to issue licenses for the construction, operation, and maintenance of hydroelectric dams located in any body of water over which Congress has jurisdiction pursuant to the Commerce Clause of the United States Constitution.[4] 16 U.S.C.A. § 797(e) (West 2000). Section 401(a)(1) of the CWA, 33 U.S.C.A. § 1341(a)(1), requires an applicant for a federal license or permit to conduct any activity that "may result in any discharge into the navigable waters," to provide the licensing or permitting agency with a certification from the state in which that discharge may occur. The purpose of the certification is to confirm that the contemplated discharge will comply with the water quality standards of the CWA and the effected state. In addi-

---

3. Maine law provides:

> (1–A) The department may only issue a waste discharge license pursuant to section 414–A, or *approve a water quality certification pursuant to the United States Clean Water Act, Section 401* ....

38 M.R.S.A. § 464(4)(F) (2001) (emphasis added).

> Federal law provides:
>
> (a) Compliance with applicable requirements; application; procedures; license suspension
>
> > (1) Any applicant for a Federal License or permit to conduct any activity including, but not limited to, the construction or operation of facilities, which may result in any discharge into the navigable waters, shall provide the licensing or permitting agency *a certification from the State in which the discharge originates or will originate,* or, if appropriate, from the interstate water pollution control agency having jurisdiction over the navigable waters at the point where the discharge originates or will originate, *that any such discharge will comply with the applicable provisions of sections 1311, 1312, 1313, 1316, and 1317 of this title.*

33 U.S.C.A. § 1341(a)(1) (West 2001) (emphasis added).

4. U.S. CONST. art. I, § 8, cl. 3.

tion, section 401(d) of the CWA, 33 U.S.C.A. § 1341(d), expressly requires the FERC to incorporate "any other appropriate requirement of State law set forth in such certification" into the license.

■ [¶ 9] Warren posits that certification authority has not vested because the operation of its dams does not result in a discharge. We disagree. Certification rights under section 401(a)(1), 33 U.S.C.A. § 1341(a)(1), vest in a state if an activity " 'may result in' a discharge." *North Carolina v. FERC*, 112 F.3d 1175, 1188 (D.C.Cir.1997). Once these certification rights have vested in the state, any conditions that the state imposes become conditions on the federal license. *Alabama Rivers Alliance v. FERC*, 325 F.3d 290, 293 (D.C.Cir.2003).

[¶ 10] The term discharge is not expressly defined anywhere in the CWA, however, section 502(16), 33 U.S.C.A. § 1362(16) (West 2001), provides that, "[t]he term 'discharge' when used without qualification includes a discharge of a pollutant, and a discharge of pollutants." This statement of inclusion provides "the nearest evidence we have of definitional intent by Congress." *North Carolina*, 112 F.3d at 1187. The phrases "discharge of pollutant" and "discharge of pollutants" are defined by section 502(12):

> The term "discharge of a pollutant" and the term "discharge of pollutants" each means (A) any *addition* of any pollutant to navigable waters from any point source, (B) any *addition* of any pollutant to the waters of the contiguous zone or the ocean from any point source other than a vessel or other floating craft.

33 U.S.C.A. § 1362(12) (emphasis added).

■ [¶ 11] An "addition" is the fundamental characteristic of any discharge.

*See North Carolina*, 112 F.3d at 1188 (a decrease in the volume of water passing through a dam's turbines adds nothing and therefore cannot be a discharge); *Alabama Rivers Alliance*, 325 F.3d at 299 (increased flow resulting from the replacement of dam turbines is an addition and therefore a discharge).

■ [¶ 12] The operation of Warren's dams does result in an addition to the waters of the Presumpscot River and therefore a discharge occurs. When a substance is removed from a navigable body of water and then redeposited into that same body of water it constitutes a discharge pursuant to section 502(12), 33 U.S.C.A. § 1362(12). *See Avoyelles Sportsmen's League, Inc. v. Marsh*, 715 F.2d 897, 923 (5th Cir.1983) ("The word 'addition' as used in the definition of the term, 'discharge,' may reasonably be understood to include 'redeposit.' "), *see also Greenfield Mills, Inc. v. Macklin*, 361 F.3d 934, 947–49 (7th Cir.2004). *Avoyelles* involved a dispute about whether the removal and redeposit of fill materials in a wetland was a discharge.[5] *Avoyelles Sportsmen's League, Inc.*, 715 F.2d at 900. The court dismissed the idea that the substance discharged must come from the outside world. *Id.* at 924 n. 43. "This reading of the definition is consistent with both the purposes and legislative history of the statute. The CWA was designed to restore and maintain the chemical, physical and biological integrity of the Nation's waters." *Id.* at 923. When "water leaves the domain of nature and is subject to private control rather than purely natural processes ... it has lost its status as waters of the United States."[6] *Dubois v.*

---

5. The present case does not involve fill material, but it does involve the identical statute defining discharge. 33 U.S.C.A. § 1362(12) (West 2001).

6. Section 401 of the CWA, 33 U.S.C.A.

*U.S. Dep't of Agric.*, 102 F.3d 1273, 1297 (1st Cir.1996). Because these waters have lost their status as *waters of the United States*, when they are redeposited into the natural course of the river it results in an addition to the *waters of the United States. See id.*

■ [¶ 13] Warren is not adding more water to the river. However, a discharge results because Warren's dams remove the water of the river from its natural course, exercise private control over the water and then *add* the water back into the river. This is a discharge pursuant to section 401(a)(1). 33 U.S.C.A. § 1341(a)(1).

■ [¶ 14] Warren argues the word "discharge" is limited to "discharge of pollutant" or "discharge of pollutants." We disagree. "Discharge" has been interpreted broadly. *See Oregon Natural Desert Ass'n v. Dombeck*, 172 F.3d 1092, 1098 (9th Cir.1998) (" 'Discharge' is the broader term because it includes all releases from point sources, whether polluting or nonpolluting."). It is generally accepted that a dam is a point source. *See Greenfield Mills, Inc.*, 361 F.3d at 947 n. 16 ("Here, the artificial mechanism of the dam was used to convey pollutants into the Fawn River, a navigable waterway. Consequently, we believe that the dam constitutes a 'point source.' "). We agree with the holding of *Oregon Natural Desert Ass'n*, 172 F.3d at 1098, that any discharge from a dam, whether polluting or not, is a "discharge" for purposes of section 401(a)(1), 33 U.S.C.A. § 1341(a)(1).

§ 1341, applies to discharges into navigable waters. Navigable waters are defined as the "waters of the United States" at section 502(7), 33 U.S.C.A. § 1362(7).

7. The U.S. Supreme Court considered the distinction between the words *includes* and *means*, outside of the CWA context, in *Helvering v. Morgan's, Inc.*, 293 U.S. 121, 125–26 n. 1, 55 S.Ct. 60, 79 L.Ed. 232 (1934):

■ [¶ 15] The term "discharge" has been broadly interpreted in the case law because the plain language of section 502, 33 U.S.C.A. § 1362, mandates such an interpretation.

[W]e look first to the plain meaning of statutory language as a means of effecting legislative intent. Unless the statute itself discloses a contrary intent, words in a statute must be given their plain, common, and ordinary meaning, such as people of common intelligence would usually ascribe to them.

*Butterfield v. Norfolk & Dedham Mut. Fire Ins. Co.*, 2004 ME 124, ¶ 4, 860 A.2d 861, 862 (citations and quotation marks omitted).

[¶ 16] "Includes" in section 502(16) must be given its plain meaning. The common definition of the word *includes* does not suggest it is a word of limitation. In order for *includes* to operate as a word of limitation it would have to be treated as a synonym for the word *means*.[7] Section 502, 33 U.S.C.A. § 1362, contains the definition of twenty-three different terms and phrases occurring within the CWA. Of those twenty-three definitions, twenty-two of them use the word *means;* only one of them, "discharge," uses *includes.*

The argument goes that unless we presume that Congress's use of the term "includes" was the result of careless drafting, it seems that Congress intentionally left the definition of discharge open.... Arguably, to give "includes"

[T]he natural distinction would be that where "means" is employed, the term and its definition are to be interchangeable equivalents, and that the verb "includes" imports a general class, some of whose particular instances are those specified in the definition.

the same meaning as "means" not only confuses the English language, but also makes a mockery of careful legislative drafting.

Alia S. Miles, Comment, *Searching For The Definition Of "Discharge": Section 401 Of The Clean Water Act*, 28 ENV.TL. L. 191, 213 (1998).

[¶ 17] Accordingly, water that has left its natural state and has been subjected to man-made control constitutes an "addition" upon its return to the same navigable waterway. Any addition to water is fundamental to the definition of the term "discharge." Therefore, the water that leaves the river and runs through the dam before returning to the river constitutes a discharge for the purposes of section 1341.

### D. BEP's Authority Under Maine and Federal Law

[¶ 18] Warren argues that the BEP exceeded its authority under federal and state law because it imposed conditions that seek to enhance water quality, conditions that were not properly adopted through rule-making, conditions that require an unauthorized dissolved oxygen criterion, and conditions that are subject to reopening. We disagree.

[¶ 19] The conditions do not exceed BEP authority. Because water quality standards are not presently being met, the BEP may impose any conditions necessary to ensure compliance with those standards. *See PUD 1 of Jefferson County v. Wash. Dep't of Ecology*, 511 U.S. 700, 715, 114

S.Ct. 1900, 128 L.Ed.2d 716 (1994); *Bangor Hydro–Elec. Co. v. Bd. of Envtl. Prot.*, 595 A.2d 438, 442 (Me.1991); 38 M.R.S.A § 464(1) (2001).

[¶ 20] States are authorized to establish water quality standards pursuant to section 303. 33 U.S.C.A. § 1313 (West 2001). "Those standards shall consist of the designated uses of the navigable waters involved and the water quality criteria for such waters based upon such uses." *PUD 1*, 511 U.S. at 714, 114 S.Ct. 1900. Pursuant to section 401(d), 33 U.S.C.A. § 1341(d), a state may require that applicants for federal permits or licenses comply with both the designated uses and water quality criteria of the state standards established under section 303. 33 U.S.C.A. § 1313.[8] *PUD 1*, 511 U.S. at 715, 114 S.Ct. 1900. A state may, in its certification, include conditions necessary to ensure that the applicant will comply with state water quality standards established pursuant to section 303, 33 U.S.C.A. § 1313, and any other appropriate requirement of state law.[9] *Id.*

[¶ 21] Maine's law is settled in this area. In *Bangor Hydro–Electric Co.*, 595 A.2d at 442 n. 4, we concluded that narrative criteria at 38 M.R.S.A. § 465 (2001 & Supp. 2004), which requires waters "of sufficient quality to support all indigenous fish species," was intended to be an integral part of the water quality standards for the BEP to consider. We also concluded, based upon the specificity of the designated uses

---

8. Even though section 303, 33 U.S.C.A. § 1313, is not specifically mentioned in section 401(d), 33 U.S.C.A. § 1341(d), it is incorporated by reference in section 301, 33 U.S.C.A. § 1311 (West 2001), which is specifically mentioned. "Section 303 is always included by reference where section 301 is listed." *PUD 1 of Jefferson County v. Wash. Dep't of Ecology*, 511 U.S. 700, 713, 114 S.Ct. 1900, 128 L.Ed.2d 716 (1994) (citations omitted).

9. Justice Stevens, in his brief concurrence, was particularly persuaded that states were not restricted in their regulation pursuant to section 401(d), 33 U.S.C.A. § 1341(d), "[n]ot a single sentence, phrase, or word in the Clean Water Act purports to place any constraint on a State's power to regulate the quality of its own waters more stringently than federal law might require." *PUD 1*, 511 U.S. at 723, 114 S.Ct. 1900.

at 38 M.R.S.A. § 465, that the Legislature's purpose for the language "suitable for the designated uses" was "that the designated uses actually be present." *Id.* at 442. We stated that when those uses are not presently being achieved, the Legislature intended the quality of the water be enhanced so that the uses are achieved. *Id.*

[¶ 22] Whether compliance has been achieved and whether the conditions imposed are necessary to ensure future compliance are factual determinations to be made by the BEP. The BEP found that the involved waters were not presently in compliance with the state water quality standards, and that the conditions imposed were necessary to ensure future compliance with Maine's water quality standards. Warren has not sufficiently challenged those factual determinations.[10]

[¶ 23] Warren argues that the BEP exceeded its authority by including "reopeners" in its certification. We disagree. The BEP included conditions in its certification that permit the certification to be reopened and the conditions amended following notice and hearing. The inclusion of these "reopeners" is permissible under both state and federal law.

[¶ 24] The U.S. Supreme Court has interpreted section 401(d), 33 U.S.C.A. § 1341(d), broadly to mean that a state may attach *any* conditions that are necessary to ensure compliance with section 303, 33 U.S.C.A. § 1313, limitations and are appropriate under state law. *PUD 1*, 511

U.S. at 713, 114 S.Ct. 1900. The "reopeners" were included as a precaution in case the conditions instituted are not sufficient to ensure compliance with state water quality standards and section 303, 33 U.S.C.A. § 1313, limitations. These "reopeners" fit within both the literal language of section 401(d), 33 U.S.C.A. § 1341(d), and the statutory interpretation of the U.S. Supreme Court. *See PUD 1*, 511 U.S. at 713, 114 S.Ct. 1900.

[¶ 25] In *PUD 1*, the court addressed certification conditions generally and not "reopeners" specifically. In *American Rivers, Inc. v. FERC*, 129 F.3d 99 (2d Cir.1997) "reopeners" were specifically addressed. The position of the FERC, opposing the inclusion of "reopeners," was recited in the court's opinion:

> The Commission primarily fears that "to accept the conditions proposed would give the state the kind of governance and enforcement authority that is critical and exclusive to the Commission's responsibility to administer a license under the Federal Power Act, a power the Courts have repeatedly concluded belongs exclusively to the Commission."

*Am. Rivers*, 129 F.3d at 111 (quoting FERC's brief).

In response, building upon the holding in *PUD 1*, the court held:

> We have no quarrel with the Commission's assertion that the FPA represents a congressional intention to establish a broad federal role in the development

---

**10.** Warren repeatedly asserts that alternative conclusions could be drawn from certain portions of the record. However, because the Board's findings of fact are reviewed for clear error, whether alternative conclusions could be drawn is not determinative. We do not substitute our judgment for that of an agency on questions of fact provided that the record substantially supports those facts. *See Int'l Paper Co. v. Bd. of Envtl. Prot.*, 1999 ME 135,

¶ 29, 737 A.2d 1047, 1054; 5 M.R.S.A. § 11007(3) (2002). The Board's findings of fact must be upheld, unless Warren can show that those findings are clearly erroneous. *See Bangor Hydro–Elec. Co. v. Pub. Utils. Comm'n*, 589 A.2d 38, 40 (Me.1991). Warren has not argued on appeal that the record does not substantially support the BEP's factual determinations.

and licensing of hydroelectric power. Nor do we dispute that the FPA has a wide preemptive reach. The CWA, however, has diminished this preemptive reach by expressly requiring the Commission to incorporate into its licenses state-imposed water-quality conditions.

*Am. Rivers,* 129 F.3d at 111 (citations and quotation marks omitted).

[¶ 26] The court explained that, even though this result seems to subject the FPA to the whims of the states, the FERC always has the power not to grant the licenses at all. *Id.* While this may occasionally produce harsh results, particularly if construction has already begun, there is no federal statutory authority supporting FERC's position that the FPA prohibits the inclusion of "reopeners." *Id.*

The Second Circuit's decision, unanimously vacating FERC's orders, is significant for several reasons. First, the decision denied FERC's authority to review or reject Section 401 conditions and required the agency to include conditions in its licenses, thereby enabling states to influence the content of the licenses. *Second, it allowed states to affect licenses already issued by FERC by recognizing the validity of state certification conditions requiring ongoing state review and approval of project changes.* Third, and most important, *American Rivers I* implemented Congress' intent in the CWA to diminish FERC's role as an exclusive hydropower decision-maker by authorizing other resource agencies to condition FERC licenses through statutory provisions like Section 401.

Michael C. Blumm & Viki A. Nadol, *The Decline of the Hydropower Czar and the Rise of Agency Pluralism,* 26 COLUM. J. ENVTL. L. 81, 106 (2001) (emphasis added).

[¶ 27] Nor does the inclusion of "reopeners" violate Maine law. Under Maine law the BEP has the authority to do that which it is granted authority to do, either expressly or by implication when that authority is essential to the full exercise of its powers specifically granted.

[P]ublic bodies ... may exercise only that power which is conferred upon them by law. The source of that authority must be found in the enabling statute either expressly or by necessary inference as an incidence essential to the full exercise of powers specifically granted.

*Hallissey v. Sch. Admin. Dist. No. 77,* 2000 ME 143, ¶ 11, 755 A.2d 1068, 1072.

[¶ 28] The BEP is expressly granted the authority to issue section 401(a)(1), 33 U.S.C.A. § 1341(a)(1), certifications pursuant to 38 M.R.S.A. § 464(4)(F)(1–A). Considering the purpose of Maine's water quality standards, stated at 38 M.R.S.A. § 464(1),[11] the authority to include "reopeners" is "essential to the full exercise of powers specifically granted" to the BEP. *See Hallissey,* 2000 ME 143, ¶ 11, 755 A.2d at 1072. This authority is essential because if the conditions are not as effective as planned, the water quality standards will not be met and the BEP's goal to "restore and maintain the chemical, physical and biological integrity of the State's waters ..." will not be achieved during the forty-year term of the FERC license.[12] The Board's interpretation of 38 M.R.S.A. § 464 as implicitly authorizing the inclusion of "reopeners" is reasonable and the

---

**11.** It is the State's objective to "restore and maintain the chemical, physical and biological integrity of the State's waters...." 38 M.R.S.A. § 464(1).

**12.** The FERC license sought by Warren is to last forty years.

statute does not plainly compel a contrary result.[13]

[¶ 29] Warren argues that the BEP applied an impermissible dissolved oxygen criteria to its certification. We disagree. This is purely an issue of statutory interpretation. The water quality standards at 38 M.R.S.A. § 465(3)(B) are regularly administered by the BEP and as stated previously are entitled to great deference. *See Thacker*, 2003 ME 30, ¶ 14, 818 A.2d at 1019. The water quality standards at 38 M.R.S.A. § 465(3)(B) are ambiguous as to whether an instantaneous standard is required. If the statute is ambiguous, courts review whether the agency's construction is reasonable. Courts do not "second-guess" an agency on issues within its area of expertise; rather, courts review only to ascertain whether its conclusions are "unreasonable, unjust, or unlawful." *See Town of Eagle Lake v. Comm'r, Dep't of Educ.*, 2003 ME 37, ¶ 5, 818 A.2d 1034, 1037. It does not matter whether an alternative interpretation would also have been reasonable, only that the interpretation adopted by the BEP was not unreasonable, unjust or unlawful. Given the purpose of Maine's water quality standards, the BEP's interpretation does not appear unreasonable, unjust, or unlawful.

[¶ 30] Finally, Warren argues that the BEP adopted a policy that constituted impermissible rule-making. We disagree. The BEP based its determinations of flow levels in the bypass reach sections on a case-by-case basis. The case-by-case determinations made by the BEP do not constitute impermissible rule-making. Not every decision made by an agency constitutes "rule making" despite the fact that many decisions seem, to some extent, legislative in character. *See Fryeburg Health Care Ctr. v. Dep't of Human Servs.*, 1999 ME 122, ¶ 9, 734 A.2d 1141, 1144 ("[A]n agency is not required to use the formal rule making procedures every time it makes a decision interpreting an existing rule."); *Mitchell v. Me. Harness Racing Comm'n*, 662 A.2d 924, 926–27 (Me.1995) (an agency's interpretation of the statutes it is charged with enforcing does not amount to rule-making).

E. Conclusion

[¶ 31] In conclusion, the BEP's interpretation of statutes regularly administered by it are entitled to great deference; the BEP's determination that CWA certification rights had vested in the state was not unreasonable; and finally, the BEP did not exceed its authority under federal or Maine law.

The entry is:

Judgment affirmed.

---

13. As stated previously,

  [t]he administrative agency's interpretation of a statute administered by it, while not conclusive or binding on this court, will be given great deference and should be upheld unless the statute plainly compels a contrary result.

  *Thacker v. Konover*, 2003 ME 30, ¶ 14, 818 A.2d 1013, 1019 (citations and quotation marks omitted).