STATE OF MAINE                           SUPERIOR COURT
                                         CIVIL ACTION
KENNEBEC, ss.                            DOCKET NO. AP-04-50

                                         KEN- DH1-5/ec/1 6

FPL ENERGY MAINE
HYDRO, LLC,

            Petitioner

            v.                           **DECISION AND ORDER**

DEPARTMENT OF
ENVIRONMENTAL PROTECTION,

            Respondent


    This matter is before the court on petition of FPL Energy Maine Hydro, LLC's

("FPL" or "petitioner") for review of final agency action pursuant to M.R. Civ. P. 80C

(2005) and petitioner's motion to strike, pursuant to M.R. Civ. P. 80C(d) and (f).

    This case involves the certification of the Flagstaff Storage Project ("Project")

(which consists of a dam, reservoir, and appurtenant facilities), and whether or not

clean water standards for the Project should be based on other similar bodies of water

(an "impoundment to impoundment" standard) or on "natural" bodies of water. Water

quality standards are implicated because of the large drawdowns hydroelectric dams

call for in order to produce energy.[1] The parties agree on the facts pertinent to the

dispute, but there are numerous procedural and legal differences between the parties

that constitute the bulk of their dispute.

    The petition alleges the following: FPL owns and operates the Project, which it

acquired from Central Maine Power in 1999. The federal Clean Water Act requires

applicants for a federal license that might involve a discharge into navigable waters to

---

[1] Hydroelectric dams can deplete reservoirs over 30 feet at a time, thereby reducing the chance of survival of aquatic life. The Department of Environmental Protection recommends drawdowns of no more than 11 feet.

obtain certification of water quality from the state in which the discharge originates. Federal Water Pollution Control Act (the "Clean Water Act") § 401, 33 U.S.C. § 1341(a)(1) (2005). From December 1996 (when CMP still owned the Project) to November 15, 2002, an application for certification was filed and then withdrawn on an annual basis with Maine's Department of Environmental Protection ("DEP" or "respondent"), without the DEP acting on it. FPL filed its requests for certification with a reservation to challenge the applicability of the certification requirement. On November 14, 2003, the DEP Commissioner issued the certification pursuant to Maine and federal law, indicating that the continued operation of the Project would not violate applicable water quality standards, subject to numerous conditions. *See* 38 M.R.S.A. §§ 361-A, 464 (2005); 33 U.S.C. § 1341(a)(1).

On December 9, 2003, Maine Rivers, Trout Unlimited, Appalachian Mountain Club, and the Natural Resources Council of Maine ("the NGOs") filed a timely appeal to the Board of Environmental Protection ("BEP" or "Board"). On July 15, 2004 the BEP granted the appeal, reversing the Commissioner's certification of the Project. This petition followed, sounding in two counts. First, that DEP exceeded its authority by engaging in the certification process at all. The Clean Water Act requires clean water certification only if there is a discharge into navigable waters and that discharge contains pollutants. *See* 33 U.S.C. § 1341. Further, the DEP has one year to act on a certification application, and if it does not do so, certification is waived. *See id.* Count I alleges that DEP's failure to act in a timely manner, and DEP's engaging in the certification process at all when no discharge or pollutant was involved resulted in DEP exceeding its mandate.

Second, FPL alleges that the Board committed errors of law and abused its discretion when it made conclusions relating to the water quality standards and

procedures for applying those standards (to be discussed further *infra*), including granting standing to the NGOs for filing their appeal in the first place.

The petition for review was filed on August 9, 2004. The certification of the record was disputed by both parties, culminating in a decision and order of April 22, 2005, denying the admission of an audio tape of BEP deliberations, but also denying the inclusion of a Federal Energy Regulatory Commission ("FERC") decision, which was made after the DEP's ruling denying certification, and thus not a decision that was relied upon by the DEP.

The petitioner's 80C brief, the DEP's and intervenor NGOs response briefs[2], and the petitioner's reply brief were all filed in a timely manner, pursuant to a scheduling order. An *amicus curiae* brief in support of petitioner's position was filed. The petitioner then filed a motion to strike and respondent DEP timely filed a reply.

When the decision of an administrative agency is appealed pursuant to M.R. Civ. P. 80C, this Court reviews the agency's decision directly for abuse of discretion, errors of law, or findings not supported by the evidence. *Centamore v. Dep't of Human Services*, 664 A.2d 369, 370 (Me. 1995). "An administrative decision will be sustained if, on the basis of the entire record before it, the agency could have fairly and reasonably found the facts as it did." *Seider v. Board of Exam'r of Psychologists*, 2000 ME 206 ¶9, 762 A.2d 551, 555 (Me. 2000) (citing *CWCO, Inc. v. Superintendent of Ins.*, 1997 ME 226, ¶6, 703 A.2d 1258, 1261 (Me. 1997)). In reviewing the decisions of an administrative agency, the Court should "not attempt to second-guess the agency on matters falling within its realm of expertise" and the Court's review is limited to "determining whether the

---

[2] Note that the NGOs are seeking to intervene pursuant to 5 M.R.S.A. § 11005 and M.R.C.P. 80C; section 11005 provides that "all parties to the agency proceeding who wish to participate in the review shall file a written appearance..." Petitioner disputes the intervenors' claim that they are a party to the agency proceeding.

agency's conclusions are unreasonable, unjust or unlawful in light of the record." *Imagineering v. Superintendent of Ins.*, 593 A.2d 1050, 1053 (Me. 1991). The focus on appeal is not whether the Court would have reached the same conclusion as the agency, but whether the record contains competent and substantial evidence that supports the result reached by the agency. *CWCO, Inc.*, 1997 ME 226, 703 A.2d 1258, 1261. "Inconsistent evidence will not render an agency decision unsupported." *Seider*, 762 A.2d 551 (citations omitted). The burden of proof rests with the party seeking to overturn the agency's decision, and that party must prove that no competent evidence supports the Board's decision. *Id.* "[Petitioner] must prove that no competent evidence supports the Board's decision and that the record compels a contrary conclusion." *Bischoff v. Board of Trustees*, 661 A.2d 167, 170 (Me. 1995).

Factual determinations must be sustained unless shown to be clearly erroneous. *Imagineering*, 593 A.2d at 1053 (noting that the Court recognizes no distinction between the clearly erroneous and substantial evidence in the record standards of review for factual determinations made by administrative agencies). "A party seeking review of an agency's findings must prove they are unsupported by *any* competent evidence." *Maine Bankers Ass'n v. Bureau*, 684 A.2d 1304, 1306 (Me. 1996) (emphasis added).

"When the dispute involves an agency's interpretation of a statute administered by it, the agency's interpretation, although not conclusive on the Court, is accorded great deference and will be upheld unless the statute plainly compels a contrary result." *Maine Bankers Ass'n*, 684 A.2d at 1306 (citing *Centamore v. Department of Human Services*, 664 A.2d 369, 370 (Me. 1995)).

**Petitioner's Brief**

The substantive dispute between the parties involves which water quality standard to apply to the Project. Petitioner's brief outlines the contours of that debate,

stating that between 1995 and 2003, DEP maintained that the Project's water quality should match that of a "natural" lake, while FPL (and CMP previously) contended that a distinct standard should apply to water storage reservoirs. The confusion surrounding the applicable water quality standard originated in 1986, when water storage reservoirs were classified as "natural" by the (then) current legislation, 38 M.R.S.A. § 465-A(1)(A), § 466(9). By 1991, when FERC re-licensed another reservoir system in Maine (Chesuncook Lake), DEP became concerned that the large drawdowns of water that occur in reservoirs meant that those impoundments would not be able to meet "natural" aquatic standards. A Maine law was thus passed in 1992 amending 38 M.R.S.A. § 464(9), to acknowledge that Chesuncook Lake would have to meet less stringent water quality standards, but that all other "existing impoundments" would have to meet so-called "Class C" standards.[3] Such an amendment of standards required a Use Attainability Analysis ("UAA") that had to be approved by the EPA. FPL maintains that such approval was granted by the EPA in 1993, and the Maine legislature amended 38 M.R.S.A. § 464(9) accordingly.

Prior to 2003, FPL and DEP agreed that Class C standards applied to the Project, but DEP interpreted that to mean that the Project had to maintain aquatic life in the reservoir akin to what would be found in a "natural" lake. FPL argues that the legislative amendments discussed *supra* were adopted precisely to combat this interpretation. Alternatively, the lower "what you see is what you get" standard applied to Chesuncook Lake would not pertain, as that lower standard was approved only for that particular project. FPL thus urges the adoption of a "middle road"—a standard higher than that adopted for Chesuncook Lake, but one lower than that

---

[3] Class C standards still require that aquatic life be sustained, but that "some changes" to aquatic life are permissible. *See* 38 M.R.S.A. § 465(4)(C) (2005).

applied to "natural" bodies of water. It thus concludes that a comparison to water storage reservoirs with drawdowns of similar magnitude would be the most appropriate way to assess whether or not the Project met acceptable water quality standards.

In 2003, Governor Baldacci signed L.D. 1059, Resolves 2003, ch. 37 ("Chapter 37") which stated in part, "The goal of the rules and any license, permit or certification must be to require that the structure and function of the resident biological community that must be maintained in a water storage reservoir is the structure and function that would be expected to exist in a water storage reservoir with a drawdown of similar magnitude."[4] There was some dispute at the state level as to whether or not Chapter 37 triggered the need for EPA approval, as it could be interpreted as introducing a new water quality standard. Therefore, without reference to Chapter 37, the DEP Commissioner approved the FPL certification application on November 14, 2003, essentially embracing the FPL position on water quality standards by stating that DEP was interpreting existing standards, not introducing a new one.

The NGOs then appealed the Commissioner's decision to the BEP. The BEP overturned the Commissioner's certification of the FPL Project, stating that the "impoundment to impoundment" standard used by DEP was contrary to that which the EPA approved in 1992, and contrary to how DEP had been interpreting existing law in recent years. The BEP urged the DEP to either obtain EPA approval of the "impoundment to impoundment" standard (embodied in Chapter 37), or conduct a UAA in order to recalibrate the water quality standards for water storage reservoirs.

As a threshold matter, petitioner argues over the standard of review, asserting that reliance on the Commissioner's initial decision should outweigh the importance of

---

[4] Chapter 37 amended 38 M.R.S.A. § 466(10), which defines "resident biological community."

the reversal of that decision by the (lay) BEP. It is the Commissioner, and not the BEP, who has the requisite expertise to interpret and administer relevant statutes. Citing *S.D. Warren Co. v. Bd. of Envtl. Prot.*, FPL maintains that though BEP is accorded deference when interpreting federal environmental statutes, that deference is due to BEP's having greater experience than do courts, not the Commissioner, in interpreting those statutes. *See* 2005 ME 27, ¶ 5, 868 A.2d 210, 214. FPL also asserts that legislative intent trumps agency interpretation of a statute when the two conflict. *See Cent. Maine Power Co. v. Maine Pub. Utils. Com.*, 436 A.2d 880, 885 (1981). As discussed *infra*, FPL will attempt to demonstrate that the legislative intent behind Maine's water classification standards conflicts with the DEP's interpretation of those standards, and thus the legislative intent should prevail.

As a secondary threshold matter, petitioner argues that the NGOs did not have standing to have appealed the Commissioner's decision to the BEP because they did not suffer a "particularized injury." *See Storer v. Dep't of Envtl. Prot.*, 656 A.2d 1191, 1192 (Me. 1995). According to petitioner, DEP regulations regarding standing are similar to the test used in Maine courts, namely whether or not a party has suffered a particularized injury as a result of a licensing or other decision. The petitioner asserts that the NGOs refer to their broad missions of environmental protection, but do not allege a sufficient harm to create standing on their behalf or through their members on their behalf. Petitioner also points out that only one of the four NGOs participated in the drafting of the new water certification standards, and the comments made at that time are in direct conflict with those made in the subsequent appeal to the BEP. If the NGOs had no standing to appeal the certification of FPL, then the BEP decision supporting that appeal must be invalidated and reversed.

Next, FPL argues that DEP waived certification altogether by failing to do so within the one year deadline established by federal statute. *See* 33 U.S.C. § 1341(a). In the alternative, the BEP decision reversing FPL's certification was made after the one-year deadline, and thus should not be upheld. FPL traces legislative history describing how an Executive Order of Governor King named the DEP as the water quality standard certifying agency under FERC regulations. The Commissioner and BEP are part of the DEP, but it is the DEP and not either one of these entities comprising it that has certification authority. Though the DEP Commissioner certified the Project within one year of FPL's most recent application, the BEP decision reversed that certification after that one-year deadline. The BEP decision was the "final agency action" and as that final agency action occurred too late, DEP should be viewed as having waived certification altogether. FPL's interpretation of timelines necessitates that it view section 401 as requiring "final agency action" when it states "If the State, interstate agency, or Administrator, as the case may be, fails to act on a request for certification, within a reasonable period of time (which shall not exceed one year) after receipt of such request, the certification requirements of this subsection shall be waived with respect to such Federal application." Section 401. FPL concedes that a court, pursuant to an 80C petition for review would be able to overturn a final agency action after that one year deadline; however an agency cannot overturn its own decision outside of that one year deadline, which is what the BEP did on July 15, 2004. FPL cites a recent Washington District Court decision—clearly not controlling authority in Maine—for the proposition that interpretations of deadlines pursuant to section 401 "must mean that the issuance of state conditions outside the one-year time period must be treated differently than the issuance of such conditions occurring within that period." *See Airport Communities Coalition v. Graves*, 280 F. Supp. 2d 1207, 1215 (W.D. Wash. 2003).

FPL's most substantive argument points to the Project's not needing to be certified at all under the Clean Water Act because it does not discharge anything, let alone pollutants, into navigable waters. The Law Court has recently determined that a discharge results when "dams remove water from its natural course, exercise private control over the water, and then *add* the water back into the river." *S.D. Warren Co. v. Bd. of Envtl. Prot.*, 2005 ME 27, ¶ 13, 868 A.2d 210, 216 (emphasis in original).[5] The Law Court urged a broad interpretation of "discharge," to include releases from a source point that are both polluting and non-polluting. *See id.* at ¶ 14, 868 A.2d at 216 (citation omitted). As section 401 applies to discharges into navigable waters, the Law Court has held that hydroelectric dams and reservoirs release such discharges, and thus certification by the DEP is required.

In order to distinguish the FPL Project from the situation that was under review in *Warren* (five contiguous hydroelectric dam projects on the Presumpscot River in Cumberland County), the petitioner asserts that Warren did not address "the question of whether Maine Water Quality Law requires the presence of a pollutant to trigger the need for certification." Petitioner maintains that this law unambiguously links "pollutant" with "discharge," such that if no pollutant is discharged, no certification is required. *See* 38 M.R.S.A. § 361-A(1) (defining "discharge" as "any spilling, leaking, pumping, pouring, emptying, dumping, disposing or other addition of any pollutant to water of the State."). Petitioner asserts that it will operate the Project in much the same manner in which it has been operated for decades, with "additional environmental enhancements" that will not produce any discharge into navigable waters. *See id.*

---

[5] The Law Court decision was affirmed by the United States Supreme Court on May 15, 2006, No. 04-1527.

FPL further contends that if certification were required, federal EPA approval was not necessary because no new standard was created for the Project. In its decision reversing the Commissioner's certification of the Project, BEP maintained that her doing so departed significantly from past DEP practice, creating a new standard for reservoirs (below Class C) and doing so would need EPA approval. As discussed *supra*, FPL states that the Project should be evaluated based on Class C criteria, which it interprets to encompass a comparison to other reservoirs, not "natural" lakes. In addition, FPL asserts that the Commissioner's interpretation of the standards does not change the standards themselves, further negating the need for EPA approval of the certification.

Drawing its argument to a close, FPL says that reversing the certification violates the Antidegredation Law, which states that "existing in-stream uses 'must be maintained and protected.'" *See* 38 M.R.S.A. § 464(4)(F)(1). Any in-stream use that has been in effect since 1975 qualifies for such protection, and FPL does not interpret the statute as prioritizing preservation of aquatic life over use of a body of water to generate electricity. *See id.* By not certifying the Project, the DEP would be disrupting an established in-stream use and thus not only violate the Antidegredation Law, but also offend Maine's stated energy policy goals, which include supporting the continued use of "indigenous hydro energy resources."

**Respondent's Brief**

The DEP begins its brief with an overview of the statutory and regulatory scheme pertaining to the certification of water quality in Maine. First, it outlines the requirements of the Clean Water Act, which echo FPL's interpretation of the statute, so will not be rehashed here. Next, DEP outlines the role of FERC in issuing new licenses for existing hydropower dams. *See* 16 U.S.C. § 808(a)(2). FERC also requires state certification of water quality (or a waiver) in order to issue a federal license. DEP also

reviews the introduction of Chapter 37, but clarifies that it could not be made into law until the EPA approves the new water quality standard implicit in it, which EPA informed DEP that it would not do by letter in November 2003.

DEP next introduces a different spin on the repeated denials of first CMP's and then FPL's certification of the Project. DEP contends that since it knew the Project would not meet the Class C standards in the years 1996-2002, it encouraged FPL to withdraw its application to prevent its being rejected. DEP then recounts how the Commissioner's decision to certify excluded a reference to the disapproved Chapter 37, but used the rational behind that policy anyway. DEP thus finds the Commissioner's contention that she was merely reinterpreting existing standards, and not relying on the EPA-disapproved Chapter 37 standards to be disingenuous.

With regard to the standard of review, DEP asserts that FPL's reliance on the fact that the BEP is a lay board and thus should not be accorded deference in interpreting statutes is misplaced and also violates Law Court precedent. DEP cites its enabling legislation to bolster its assertion that the BEP has both the responsibility to hear appeals of the Commissioner's decisions and that in doing so, it may "adopt, modify, or reverse the findings of fact or conclusions of law established by the Commissioner." *See* 38 M.R.S.A. § 341-D(4)(A). In *Warren*, the Law Court specifically addressed the fact that a lay board is due deference, and that "The standard is whether the subject matter is beyond the scope of BEP expertise." 2005 ME 27, ¶ 6, 868 A.2d 210, 214. DEP states that BEP has the requisite experience and expertise in interpreting relevant statutes as evidenced by the appeal it considered in the *Warren* case.

DEP then refutes the argument that the NGOs lack standing by emphasizing that "aggrieved person" is broadly defined by departmental regulations, as including any individual, partnership, corporation, government entity, association or public or private

organization of any character that the Board determines may suffer particularized injury as a result of a licensing or other decision. The DEP contends that the BEP had substantial evidence before it, including affidavits from members of the NGOs, indicating that the intervenors met that standard.

DEP then addresses FPL's contention that DEP waived certification because final agency action was not completed within one year, per section 401 of the Clean Water Act. A portion of DEP's argument relies on a different interpretation of *Airport Communities Coalition v. Graves*, the Washington case that FPL relied upon in its brief, for the proposition that an agency cannot overturn its own decision outside of the one-year deadline. DEP contends that *Airport Communities* is more properly read to provide the federal agency with discretion to consider state agency decisions made outside of the one-year deadline. The remainder of DEP's argument in this section relies on the FERC decision specifically stricken from the record by this court, and thus subject to petitioner's separate motion to strike.[6] DEP maintains that the FERC decision dismisses FPL's arguments that an agency must act and decide any appeals relating to that action within a one-year deadline.[7]

DEP next invokes the Law Court's *Warren* decision in an effort to definitively refute FPL's contention that the Project can escape the need for certification. Until the Supreme Court ruled on the appeal, the Law Court's decision from earlier this year was controlling law on the matter, and the Law Court unanimously rejected FPL's arguments regarding the meaning of "discharge" and the relationship of that term to

---

[6] *See FPL Energy Maine Hydro LLC,* 108 F.E.R.C. ¶ 61261 (September 21, 2004), 2004 FERC LEXIS 1939, *rehearing denied* at 111 FERC ¶ 61104 (April 19, 2005), 2005 FERC LEXIS 1003.

[7] In its Response to FPL's Motion to Strike, the DEP contends that it relies on the FERC decision as persuasive legal authority, and not as part of the certified administrative record, from which the FERC decision was excluded by this court. Because the FERC decision is submitted as part of argument, the motion to strike must be denied.

the certification process. *See S.D. Warren Co. v. Bd. of Envtl. Prot.*, 2005 ME 27, ¶ 13, 868 A.2d 210, 216. Further, DEP emphasizes that Maine state law incorporates federal law by reference, the relevant federal law being that which requires states to certify water quality before federal hydropower licenses are issued. DEP thus properly participated in the certification process and it was necessary that it do so in order to comply with both state and federal regulations.

As for the anti-degredation policy, DEP agrees that some sort of balancing test is necessary to weigh the importance of the competing uses of in-stream water—sustaining aquatic life versus generating energy; that balancing test exists in the form of a UAA. DEP opines that a UAA may indeed determine that hydro energy generation should be prioritized over sustaining aquatic life, but until the proper analysis is performed, the anti-degredation policy does not in and of itself require certification, or prioritize the energy-related use.

Finally, DEP argues that the Project does not meet applicable water quality standards as a matter of law. Focusing again on the term "discharge," DEP takes issue with FPL's relying on a definition of the term that necessitates pollutants to be present for there to be a discharge. As the Project does not involve pollutants, so FPL argues, there is no discharge, so it should be exempt from the certification process. But as DEP points out, depleting 95% of a reservoir in order to generate energy substantially degrades the water quality whether or not pollutants or a discharge are involved. By enacting water quality standards, it was the Maine's legislature's intent to "restore and maintain the chemical, physical, and biological integrity of the State's waters and to preserve certain pristine state waters." *See* 38 M.R.S.A. § 464(1). The DEP maintains that the major depletion of the reservoir involved in the Project does not maintain the "integrity" of the body of water and thus frustrates the legislative intent behind Maine's

water classification scheme. Further, DEP notes that there would not have been a need to introduce Chapter 37, which attempted to relax the water quality standard for impoundments, if some type of water quality standards did not apply to impoundments in the first place.

**Petitioner's Reply Brief**

With regard to the standard of review, FPL repeats its argument from its petition, agreeing with the need for the BEP to have expertise in environmental statutory interpretation, but then contending that a lay board could not possibly have such expertise. But the case FPL cites to support this proposition, *Isis Dev., LLC v. Town of Wells*, concerns a local zoning board, not the BEP, which is charged with and has experience in interpreting a complex regulatory and statutory scheme. *See* 2003 ME 149, ¶ 3, n.4, 836 A.2d 1285.

As for the NGOs lacking standing, FPL dismisses the significance of the organization members' affidavits, which attest to their personally fishing, canoeing, and hunting waterfowl in the waterways affected by the Project. FPL maintains that its proposed operation of the Project will not affect these activities, and thus without a "particularized injury" the NGOs had no standing to file their appeal, and it should be dismissed.

The thrust of the petitioner's reply hones in on the interpretation of "discharge," emphasizing that it is only hydroelectric facilities that discharge pollutants that are subject to certification; as FPL does not discharge pollutants, it should be exempt from the process. FPL also reviews the legislative history and intent behind the appropriate water quality standard that should apply to the Project, fine-tuning in detail the arguments it made in its petition.

An angle that was relegated to footnotes in the initial briefs, but is given some prominence in the reply is the notion of whether a denial of certification would result in an unconstitutional taking of the Project from FPL. It is worth noting that the BEP's denial of certification was without prejudice, however, and allows for a UAA to determine the appropriate water quality standards to apply to the Project. Only then will a final determination be made as to whether the Project can be operational. Though FPL urges the court to interpret statutes to avoid an unconstitutional result (a taking), the BEP's decision does not end the process of certification, but extends that process out to include a UAA.

The court is satisfied the intervenors or NGOs have standing. While standing is a question of law, the issue is factually driven. The court accepts the BEP determination of their qualification as intervenors based upon its findings of fact.

The court is satisfied that *Airport Communities Coalition v. Graves* stands for the proposition that the federal agencies are not bound by the decisions when the state "fails or refuses to act on a request for certification within a reasonable period of time (which shall not exceed one year) after receipt of such request" by decisions issued beyond the one-year limitation. 280 F.Supp.2nd at 1217; 33 U.S.C. § 1341(a)(1). The court finds no jurisdictional implications for state action affecting the final agency action of the DEP.

The petitioner asserts that the so-called Chapter 37 Resolve does not change the class C water quality classification and therefore it may rely upon the 1993 EPA water quality standards and no further approval by the EPA is necessary. The DEP posits that to the extent the resolve attempts to change a "natural lake" standard to a "impoundment to impoundment" standard, it is a change in the water quality standard requiring EPA approval. It appears to the court that whether or not it is a change of

standard is a technical decision based upon the facts of the science, clearly a matter within the expertise of the agency and not subject to decision by this court based upon the evidence put before it. This deference requires the court to reject the argument of petitioner to overturn the agency action based upon the resolve. The court particularly notes the position of the BEP suggesting that the DEP either obtain EPA approval of the Chapter 37 water quality standard or conduct a UAA to recalibrate the water quality standards for water storage reservoirs. This court infers that such a policy statement by the BEP would prevail in the future actions of the DEP.

The remaining and most substantive issue before this court is whether or not the certification in question is required under the federal Water Quality Act based upon a jurisdictional requirement of the existence of a "discharge" and whether the facts of this case give rise to the existence of a "pollutant" as defined in that law. The thrust of FPL's arguments were disposed of by the Law Court in *Warren*, and the affirming decision of the U.S. Supreme Court is controlling. The Project releases a "discharge" and is thus subject to existing water quality standards, which were justly interpreted by the BEP to deny certification to FPL for the Project.

The entry will be:

> Petitioner's motion to strike respondent's extra-record materials referenced in and attached to intervenor's and respondent's brief is DENIED; the Board of Environmental Protection Order granting appeal and denying water quality certification dated July 15, 2004, in the matter of FPL Energy Maine Hydro, LLC is AFFIRMED.

Dated: May___25___, 2006

Donald H. Marden
Justice, Superior Court

Date Filed __8/9/04__   _____Kennebec_____   Docket No. __AP04-50__
                                County

Action ___Petition for Review_____
                    80C

# J. MARDEN

__FPL Energy Maine Hydro, LLC__   VS.   __Department of Environmental Protection__

| Plaintiff's Attorney | Defendant's Attorney |
|---|---|
| Matthew D. Manahan, Esq.<br>One Monument Square<br>Portland, Maine  04101 | Andrew A. Cadot, Esq.(MR,TU,AMC,NRCN)<br>Stephen D. Wilson, Esq.<br>One Canal Plaza<br>P.O. Box 426<br>Portland, Maine  04112-0426<br>- Gerald E. Reid, AAG  (DEP)<br>6 State House Station<br>Augusta, Maine  04333-0006 |

| Date of Entry | |
|---|---|
| 8/9/04 | Petition for Review, filed. s/Manahan, Esq. |
| 8/12/04 | Written Appearance of Maine Rivers, Trou Unlimited, Appalachian Mountain Club, and Natural Resources Council of Maine, filed. s/Cadot, Esq. |
| 8/18/04 | Motion for Enlargment of Time to File Administrative Record, filed. s/Reid<br>Proposed Order, filed. |
| 8/19/04 | Letter from attorney Reid informing court of no objections to the motion for enlargement |
| | ORDER ON MOTION FOR ENLARGEMENT, Studstrup, J. (dated 8/18/04)<br>Time enlarged to October 5, 2004.<br>Copies mailed to attys of record. |
| 10/5/04 | Dep's Unopposed Motion for Second Enlargment of Time to File Administrative Record, and for Other Procedural Relief, filed. s/Reid, AAG<br>Proposed Order, filed. |
| 10/13/04 | ORDER ON MOTION FOR ENLARGEMENT, Studstrup, J.<br>Time extended to November 15, 2004.<br>Copies mailed to attys. |
| 10/15/04 | Administrative Record, filed. s/Reid, AAG    (2 boxes in vault)<br>Index to Record, filed. s/Reid, AAG<br>Certification of Record, filed. s/Dawn Gallagher, Comm. |
| 10/18/04 | Notice of briefing schedule mailed to attys. |
| 10/28/04 | Letter regarding notice and briefing schedule, filed. s/Manahan, Esq. |
| 11/15/04 | Motion of FPL Maine Hydro LLC to Modify the Contents of the Record with Request for Hearing and Proposed Order, filed. |
| 12/3/04 | Intervenors' Response to Petitioner's Motion to Modify Contents of the Record, filed. s/Cadot, Esq. |
| 12/6/04 | Respondent Dep's Memorandum in Opposition to FPL Energy's Opposition to Modify the Contents of the Record, filed. s/Reid, AAG |